IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

CLINTON L., by his guardian and next )
friend CLINTON L., SR.; TIMOTHY B., )
by his guardian and next friend ROSE B.; )
VERNON W., by his guardian and next )
friend VERNON D.W.; STEVEN C.; )
JASON A., by his guardian and next friend )
BRENDA A.; and DIANE D., )
by her guardian and next friend )
THOMAS S., )
                                              )
                    Plaintiffs, )
                                              )
                    v. )          1:10CV123
                                              )
ALBERT DELIA, in his official )
capacity as Secretary of the Department )
of Health and Human Services, and )
PAM SHIPMAN, in her official )
capacity as CEO and Area Director )
of Piedmont Behavioral Healthcare )
Local Management Entity, )
                                              )
                    Defendants. )

## MEMORANDUM OPINION AND ORDER

BEATY, Chief Judge.

      This matter is before the Court on Motions for Summary Judgment [Doc. #86 & #88] by Defendants Albert Delia and Pam Shipman.[1] For the reasons discussed below, Defendants'

---

[1] Albert Delia is the Acting Secretary of the North Carolina Department of Health and Human Services and was substituted for Lanier M. Cansler as a named Defendant in this action by an Order of this Court [Doc. #99]. Pam Shipman is the current CEO of Piedmont Behavioral Healthcare and was substituted for Dan Coughlin as a named Defendant in this action by an Order of this Court [Doc. #99].

Motions for Summary Judgment [Doc. #86 & #88] are DENIED.

I.    FACTUAL BACKGROUND[2]

Plaintiffs Clinton L., Timothy B., Vernon W., Steven C., Jason A., and Diane D. suffer from a variety of disabling conditions, including dual diagnoses of mental retardation and mental illness. They receive health care and other services through North Carolina's Department of Health and Human Services ("DHHS"). Pursuant to contracts with DHHS, the health care and other services are administered and managed by Piedmont Behavioral Healthcare ("PBH"), which is the Local Management Entity ("LME") for Cabarrus, Davidson, Rowan, Stanly, Union, Alamance, and Caswell Counties. One type of service administered by PBH is the "Supervised Living" service, which is a residential service that includes room and support care for individuals who need 24-hour supervision and for whom care in a more intensive treatment setting is considered unnecessary on a daily basis. Prior to the initiation of this lawsuit, five of the Plaintiffs, namely Clinton L., Timothy B., Vernon W., Steven C., and Diane D., previously received Supervised Living services that allowed them to live alone with 24-hour care and supervision, while one of the Plaintiffs, namely Jason A., received 24-hour care and supervision in a three-bedroom home shared with one roommate. In these Supervised Living arrangements, each Plaintiff had at least one staff person with them in their residence 24 hours a day.

However, as a result of state budget reductions implemented through North Carolina Session Law 2009-451, PBH announced on January 11, 2010, that it was changing the rates that

---

[2] Portions of this Factual Background were previously set out in the Court's Order granting a preliminary injunction in this case [Doc. #36], but are restated here to provide background information as part of the present Order.

2

it would pay to providers for Supervised Living services for one-person and two-person placements (that is, placements where individuals lived on their own or with one other person with 24-hour staff supervision). Under this change, PBH reduced the rates for one-person or two-person placements down to $116.15 per day, which was the rate for three-person placements (that is, placements where an individual lives with two other people with 24-hour staff supervision). This change only affected the state-funded portion of what PBH coordinates and did not relate to the Medicaid funding for Supervised Living, which PBH administers as the "Innovations Waiver" program.

Plaintiffs allege that due to the reduction in the reimbursement rates for the state funding, Plaintiffs will be "forced into congregate living environments that have already been found to be inappropriate for their case," and "[i]f and when Plaintiffs' placement in a congregate setting . . . are determined to have failed (as is expected), it is believed that Plaintiffs will face forced institutionalization because they would not have the level of support required to maintain their community placements." (Second Am. Compl. ¶ 95-96). Accordingly, Plaintiffs brought the present suit asserting claims under both Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act against Defendant Pam Shipman in her official capacity as CEO and Area Director of PBH (referred to as "Defendant PBH" or "PBH" for ease of reference) and against Defendant Albert Delia in his official capacity as the Secretary of the North Carolina Department of Health and Human Services.

Since the rate reductions for one-person and two-person placements, each Plaintiff's care plan has been modified to varying degrees. Specifically, Clinton L. and Vernon W. have

3

continued to reside by themselves in their own homes with 24-hour staffing, just as before the rate cuts, but the number of rotating staff available has been reduced for both Plaintiffs. Timothy B. has moved from a single-person placement with staff proficient in American Sign Language to a two-person placement where the American Sign Language abilities of the staff members are disputed by the parties. Steven C.'s placement has changed four times since the rate reductions, with his most recent placement being in a single-person residence. Jason A. has continued to reside in the same three-person group home as before the rate reductions, but a third roommate was added to his residence. Finally, Diane D. has moved from a single-person placement into a three-person group home. Generally, these modifications to each Plaintiff's care services subsequent to the rate reductions are undisputed by both Plaintiffs and Defendants.

However, Plaintiffs and Defendants take opposing positions regarding the overall effects of these modifications on each Plaintiff, namely, the level of risk of institutionalization each Plaintiff faces after the rate reductions. Specifically, Defendants offer an Expert Report from psychologist Bonny J. Forrest, J.D., Ph.D., and an Expert Report from psychiatrist Craig B. Hummel, Medical Director at PBH. Both Reports contain an evaluation of each Plaintiff and generally conclude that no Plaintiff identified herein currently faces a serious risk of institutionalization. Instead, both Reports conclude that each Plaintiff is successfully adapting to his or her new care environment and further note that many of the Plaintiffs are benefitting from the social interaction and integration available in group settings. In contrast, Plaintiffs offer an Expert Report from psychologist James W. Bodfish, M.A., Ph.D., which contains an

4

evaluation of each named Plaintiff and generally concludes that each Plaintiff faces a serious risk of institutionalization due to the modifications to each Plaintiff's care services. In his Report, Dr. Bodfish details specific changes to each Plaintiff's care plan and specific factors creating a serious risk of institutionalization for each Plaintiff.

Defendants have each filed a separate Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 in response to the Plaintiffs' claims. Defendant PBH's Motion for Summary Judgment contends that there are no genuine issues of material fact regarding the level of risk of institutionalization facing the Plaintiffs, and Defendants are entitled to judgment as a matter of law on Plaintiffs' ADA and Rehabilitation Act claims. Defendant Delia, who joins and adopts Defendant PBH's Motion for Summary Judgment regarding Plaintiffs' ADA and Rehabilitation Act claims, also advances a separate argument in his Motion for Summary Judgment, contending that there are no genuine issues of material fact regarding whether, as Secretary of DHHS, Defendant Delia satisfied his duty of oversight and monitoring of PBH. The Court will consider these contentions in turn.

II. ANALYSIS

    A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202

5

(1986).

The movant bears the initial burden of demonstrating "the absence of any genuine issues of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). Once the movant has met the initial burden, the nonmoving party must "present evidence from which a jury might return a verdict in his favor." Anderson, 477 U.S. at 257, 106 S. Ct. at 2514. There can be no genuine issue as to any material fact if the non-movant fails to "make a showing sufficient to establish the existence of an element essential" to his case. Celotex, 477 U.S. at 322-23, 106 S. Ct. at 2552. While all justifiable inferences are drawn in favor of the non-movant, he "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.

Moreover, the Court should not grant a motion for summary judgment "'unless the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the adverse party cannot prevail under any circumstances.'" Campbell v. Hewitt, Coleman & Assocs., 21 F.3d 52, 55 (4th Cir. 1994) (quoting Phoenix Sav. & Loan, Inc. v. Aetna Casualty & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967)). A mere scintilla of evidence is insufficient to withstand a motion for summary judgment. Anderson, 477 U.S. at 252, 106 S. Ct. at 2512. Instead, there must be evidence "on which the jury could reasonably find for the plaintiff." Id. With this standard in mind, the Court will evaluate the merits of Plaintiffs' claims to determine whether summary judgment in favor of Defendants is proper in this case.

6

Case 1:10-cv-00123-NCT-JEP   Document 102   Filed 10/31/12   Page 6 of 12

B.      Title II of the ADA and Rehabilitation Act Claims

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Regulations implementing Title II of the ADA require that a public entity administer its services, programs and activities in "the most integrated setting appropriate" to meet the needs of qualified individuals with disabilities.[3] 28 C.F.R. § 35.130(d). The Rehabilitation Act imposes similar obligations on recipients of federal financial assistance. 29 U.S.C. § 794; 28 C.F.R. § 41.51(d).

Specifically, the Plaintiffs here are alleging a violation of the integration mandate as addressed in Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 119 S. Ct. 2176, 144 L. Ed. 2d 540 (1999). Under Olmstead, unjustified institutional isolation of individuals with disabilities is a form of discrimination under the ADA. Id. at 597, 119 S. Ct. at 2185. Accordingly, to comply with the ADA's integration mandate, states must provide community-based treatment for persons with mental disabilities when: (1) the state determines that community-based placement is appropriate; (2) the individual does not oppose community placement; and (3) community placement can be reasonably accommodated. Id. at 607, 119 S. Ct. at 2190.

Further, institutionalization is not a prerequisite to enforcement of the ADA's integration mandate. Fisher v. Oklahoma Health Care Auth., 335 F.3d 1175, 1181 (10th Cir. 2003). Here,

---

[3]This regulation is commonly referred to as the "integration mandate" and will be referred to as such in this Order.

7

Case 1:10-cv-00123-NCT-JEP   Document 102   Filed 10/31/12   Page 7 of 12

each Plaintiff is currently living in a community setting, and the Expert Reports described in the Factual Background above address each Plaintiff's risk of institutionalization following PBH's rate reductions. Overall, the Experts provided by Plaintiffs and Defendants used different methods to evaluate the severity of the risk facing each Plaintiff and reached different conclusions regarding the ultimate level of risk facing each Plaintiff. Specifically, Dr. Bodfish's Report notes that the reduction in the number of rotating staff for Clinton L. and Vernon W. places them both at a higher risk of institutionalization due to documented staff shortages and insufficient funding to provide for emergency back-up staff. As to Timothy B., Dr. Bodfish's Report concludes that frequent staff turnover, longer staff shifts, and a lack of staff proficient in American Sign Language have all contributed to Timothy B. facing a serious risk of institutionalization. Further, Dr. Bodfish's Report determines that Steven C.'s multiple changes in residency involving both group and single-person placements increased his historical behavior problems, thus creating a serious risk of institutionalization. Similarly, Dr. Bodfish's Report concludes that a reduction in staff supervision and an addition of a new roommate into Jason A.'s group home led to an increase in Jason A.'s historical behavior problems, placing him at a serious risk of institutionalization. Finally, as to Diane D., Dr. Bodfish's Report determines that Diane D. faces a serious risk of institutionalization since her transition into a group placement as evidenced by specific outbursts and incidents with her roommate, one of which led to Diane D. being incarcerated for four days.

However, the Expert Reports submitted by the Defendants conclude that none of the Plaintiffs face a serious risk of institutionalization due to the modifications to their care services.

8

Instead, the Reports determine that the Plaintiffs are successfully adjusting to any changes in their care services. Due to these contrasting conclusions, the expert evidence submitted indicates that summary judgment is not appropriate, and the case would be most properly decided at the trial stage, where a judge or jury could "weigh the evidence and the credibility of each expert." Mosser v. Fruehauf Corp., 940 F.2d 77, 83 (4th Cir. 1991); see also Webster v. Offshore Food Serv., Inc., 434 F.2d 1191, 1193 (5th Cir. 1970) ("[T]he grant of a motion for summary judgment is often inappropriate where the evidence bearing on crucial issues of fact is in the form of expert opinion testimony.").

In addition to the differing Expert Reports, depositions of family members and caregivers, affidavits, contract documents, correspondence, and internal forms contain conflicting accounts of the level of risk of institutionalization facing each Plaintiff. Thus, the entirety of the evidence submitted to the Court indicates that a jury could "reasonably find for the plaintiff." Anderson, 477 U.S. at 252, 106 S. Ct. at 2512. Accordingly, the Court finds that genuine issues of material fact exist with respect to Plaintiffs' ADA and Rehabilitation Act Claims. As such, the Court will deny Defendant PBH's Motion for Summary Judgment.

C. Defendant Albert Delia's Motion for Summary Judgment

As noted above, while Defendant Delia joins the arguments advanced by Defendant PBH regarding Plaintiffs' ADA and Rehabilitation Act claims, Defendant Delia also advances a separate argument regarding his duty of oversight as Secretary of the North Carolina DHHS, contending that Plaintiffs have provided no evidence or case law to support a claim that he failed to adequately supervise the actions of PBH.

The North Carolina DHHS is the single state agency responsible for the administration and supervision of North Carolina's Medicaid program. Under the North Carolina General Statutes, the Secretary of DHHS is specifically required to establish "comprehensive, cohesive oversight and monitoring procedures and processes to ensure continuous compliance by area authorities, county programs, and all providers of public services with State and federal policy, law, and standards." N.C. Gen. Stat. § 122C-112.1(a)(6). Additionally, under federal regulations, the State must ensure that each Prepaid Inpatient Health Plan[4] "complies with any other applicable Federal and State laws," including Title II of the ADA and the Rehabilitation Act. See 42 C.F.R. § 438.100(d).

Further, PBH receives its state and federal funding pursuant to contracts with various divisions of the North Carolina DHHS, including the Division of Mental Health, Behavioral Health, and Substance Abuse Services ("Division") and the Division of Medical Assistance ("DMA"). These contracts both incorporate a duty to comply with federal law. The contract between the Division and PBH contains a provision specifically noting that both PBH and the Division "shall comply with all laws . . . that are applicable to the conduct of its business, including those of federal, state, and local agencies having jurisdiction and/or authority." (Contract between North Carolina DHHS, Division of Mental Health, Behavioral Health, and Substance Abuse Services and PBH [Doc. #10-1], at 4). Further, the contract between PBH and DMA specifically states that PBH "shall comply with all Federal and State laws which prohibit

---

[4]PBH is organized as a Prepaid Inpatient Health Plan and is thus included within the regulation's express language.

discrimination" including the ADA and the Rehabilitation Act. (Contract between North Carolina DHHS, Division of Medical Assistance and PBH dated May 1, 2011 [Doc. #91-2], at 8). However, while the contract between PBH and DMA places the duty to comply with federal law on PBH, Defendant Delia cannot contract away his own duty to ensure compliance with federal law as recognized in state statutes and federal regulations. See McCartney ex rel. McCartney v. Cansler, 608 F. Supp. 2d 694, 701 (E.D.N.C. 2009), aff'd sub nom. D.T.M. ex rel. McCartney v. Cansler, 382 F. App'x 334 (4th Cir. 2010) ("As North Carolina's 'single state agency,' it is the duty of [DHHS], and defendant as Secretary of [DHHS], to ensure that North Carolina's Medicaid program is administered in compliance with federal law."); J.K. ex rel. R.K. v. Dillenberg, 836 F. Supp. 694, 699 (D. Ariz. 1993) ("It is patently unreasonable to presume that Congress would permit a state to disclaim federal responsibilities by contracting away its obligations to a private entity.").

While the reductions at issue here are to the state-funded portion of Supervised Living services and not to the federally-funded Medicaid portion, that does not absolve Defendant Delia of responsibility for any potential violations of federal law by PBH in its administration of state funds. Accordingly, to the extent that the Court has found that genuine issues of material fact exist with regard to PBH's liability on Plaintiff's ADA and Rehabilitation Act claims, such liability may be imputed to Defendant Delia. See McCartney ex rel. McCartney, 608 F. Supp. 2d at 701 ("[DHHS] may not disclaim its responsibilities under federal law by simply contracting away its duties."). As such, the Court will deny Defendant Delia's Motion for Summary Judgment.

11

III.  CONCLUSION

After having considered all of Defendants' contentions, the Court finds that there are genuine issues of material fact precluding summary judgment for Defendants as to the Plaintiffs' claims. IT IS THEREFORE ORDERED that Defendants' Motions for Summary Judgment [Doc. #86 & #88] are DENIED.

This, the 31st day of October, 2012.

_____
United States District Judge