**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| CLINTON L., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 1:10CV123 |
| | ) | |
| ALDONA WOS, in her official capacity | ) | |
| as Secretary of the Department of | ) | |
| Health and Human Services, and | ) | |
| PAMELA SHIPMAN, in her official | ) | |
| capacity as CEO and Area Director | ) | |
| of the Piedmont Behavioral Healthcare | ) | |
| Local Management Entity, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION**

This case involves the reduction of a state-funded service available to community-based individuals suffering from mental retardation and/or mental illness. Plaintiffs filed the instant action contending that the reduction would either cause their service providers to withdraw from providing the relevant service or to offer the service at a reduced level, thus placing them at risk of institutionalization in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Moreover, Plaintiff Timothy B., who, in addition to mental retardation and mental illness, suffers from deafness, separately claims that Defendants have failed to provide him effective, accessible communication or appropriate auxiliary aids in the delivery of services in violation of 28 C.F.R. § 35.160. Following thirty-nine days of evidence and argument, it is concluded that Plaintiffs have been unable to carry their burden as to each of their claims.

This Memorandum Opinion states the Court's findings of fact and conclusions of law.[1]

I.

The North Carolina Department of Health and Human Services ("DHHS") uses both Medicaid and non-Medicaid (i.e., state and local) funds to provide mental health, developmental disability, and substance abuse services to qualifying individuals. See N.C. Gen. Stat. §§ 143B-137.1; 122C-112.1. Pursuant to N.C. Gen. Stat. § 122C-115.4, as well as contracts with the DHHS Division of Mental Health, Developmental Disabilities and Substance Abuse Services ("NCDMH") (DX-2) and the DHHS Division of Medical Assistance ("NCDMA") (DX-15), Piedmont Behavioral Healthcare ("PBH") operates as a local management entity ("LME") to manage those funds and to plan, develop, implement and monitor mental health and developmental disability services within its catchment area. See N.C. Gen. Stat. § 122C-115.4(b)(7); N.C. Gen. Stat. § 122C-115.4(a); DX-15.[2] As an LME, PBH does not provide services

---

[1] Plaintiffs bring their claims against Aldona Wos and Pamela Shipman in their official capacities. See Doc. #1. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).

[2] During the pendency of this action, PBH became Cardinal Innovations Healthcare Solutions ("Cardinal Innovations"). Because a majority of the documentary and testimonial evidence in this action references PBH as opposed to Cardinal Innovations, for the sake of clarity and consistency, this Memorandum Opinion will refer solely to PBH. At the time Plaintiffs filed this action, PBH's catchment area consisted of five counties: Cabarrus, Davidson, Rowan, Stanly and Union. As of the most recent information presented to the Court, PBH now serves a catchment area of fifteen counties which, in addition to the previously-named five, includes Alamance, Caswell, Chatham, Franklin, Granville, Halifax, Orange, Person, Vance and Warren counties.

itself, but rather contracts with a network of providers who administer those services. DX-2; 10/10/13 Tr. at 8:22-9:3 (Yon).[3]

At issue in this case is PBH's decision, effective February 15, 2010, to reduce the reimbursement rate it pays to its service providers for Supervised Living services - a state-funded service available to individuals diagnosed with mental retardation and/or mental illness living in community settings who need 24-hour supervision and for whom care in a more intensive treatment setting is considered unnecessary on a daily basis (PX-201 at 2). See Doc. #1.[4] Prior to February 2010, PBH reimbursed providers in its network for Supervised Living services they provided to consumers living in one-, two- or three-person placements on a tiered basis.[5] A one-person placement (that is, a residential placement in which there is only one consumer) received a variable rate (see

---

[3] An LME is a "local political subdivision of the State." N.C. Gen. Stat. § 122C-116(a).

[4] On the afternoon of the final day of closing arguments, Plaintiffs argued that the Court need not consider solely the Supervised Living reimbursement rate reduction, but all service deficiencies which might place Plaintiffs at significant risk of institutionalization. See 11/14/13 Tr. at 131:2-9. This action, however, was filed and tried on the theory of risk of institutionalization caused specifically by the reduction in the Supervised Living reimbursement rate. Accordingly, the Court declines Plaintiffs' invitation to expand the theory of liability at such a late stage and focuses only on the effects of the Supervised Living rate reduction. As to the criteria for reception of Supervised Living services, although the relevant documentation, as well as the testimony of Melissa Covert, a manager within PBH, identified the requirements that an Axis I or Axis II diagnosis is present (see PX-201 at 3; 9/19/13 Tr. at 176:6-8 (Covert)), Anna Yon, PBH's Regional Executive Director, testified that of the 31 recipients of Supervised Living services of whom she was aware within PBH's network, all were dually diagnosed with a developmental disability and a mental health issue (10/11/13 Tr. at 54:8-19 (Yon)).

[5] Providers billed Supervised Living services provided to consumers living in one-, two-, and three-person placements under codes YM811, YM812, and YM813, respectively. (See DX-1). Although supervised living services are also available in four-, five- and six-person placements (billed under service codes "YM814," "YM815," and "YM816," respectively (see 10/10/13 Tr. at 58:2-7 (Yon)), those are not at issue in the instant action.

-3-

DX-1), a two-person placement (that is, a residential placement in which the consumer lives with one additional housemate) received a rate of $161.99 per day (see id.), and a three-person placement (that is, a residential placement in which the consumer lives with two additional housemates) received a rate of $116.15 per day (see id.). Effective February 15, 2010, as a result of state budget cuts, PBH reduced the reimbursement rate paid providers for the provision of Supervised Living services in one- and two-person placements to the same $116.15 per day rate it pays for Supervised Living services provided in three-person placements. See id.; 10/10/13 Tr. at 76:15-20 (Yon). Despite this reduced rate, providers remain eligible to receive a higher rate if they submit, and PBH approves, an Enhanced Rate Request. See 9/20/13 Tr. at 4:8-7:5 (Covert). Approved Enhanced Rate Requests are valid only for a temporary period, but, through review and re-approval, they can extend indefinitely. See id. at 8:20-9:1 (Covert), 28:15-29:4 (Covert).

Plaintiffs, all of whom are dually diagnosed with mental illness and developmental disability, lived in one- or two-person placements prior to the February 15, 2010 reimbursement rate reduction, and the providers serving each of the Plaintiffs received a reimbursement rate greater than $116.15 per day for the provision of Plaintiffs' Supervised Living services. Originally consisting of only Clinton L. and Timothy B., Plaintiffs filed this action on February 11, 2010, contending that the reduced reimbursement rate for Supervised Living services would force them into congregate placements and that, "[i]f and when Plaintiffs' placement in a congregate setting are [sic] determined to have failed (as is expected), it is believed that [] Plaintiffs will

face forced institutionalization." Doc. #1, ¶¶ 56-58.[6]  On that same day, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction seeking to "prohibit[] Defendants from implementing any reductions to the daily reimbursement rate for Supervised Living services." Doc. #4 at 1. Following a hearing on that Motion held on February 17, 2010, then-Chief United States District Judge James A. Beaty denied Plaintiffs' Motion as to Clinton L. without prejudice to refiling on the basis that Clinton's provider at the time determined that it would continue providing Clinton's Supervised Living services after the rate reduction.  See Doc. #16 at 3-4.  With respect to Timothy, Judge Beaty set a supplemental hearing on April 16, 2010 - the date up to which PBH agreed to maintain Timothy's pre-rate reduction rates.  See id. at 4-6.

On April 7, 2010, Plaintiffs - by this time consisting of Clinton L., Timothy B., Vernon W., and Steven C.[7] - filed a Renewed Motion for Preliminary Injunction which again sought to "prohibit[] Defendants from implementing any current or planned reductions to the daily reimbursement rate for Supervised Living services . . . to preserve Plaintiffs' level of care and community placements in their own homes." Doc. #22 at 1-2. Judge Beaty held a hearing on Plaintiffs' Renewed Motion on April 14, 2010 (see Docket Entry dated April

---

[6] Plaintiffs did not present Timothy B.'s separate accommodation claim until they filed their Third Amended Complaint on June 28, 2013.  See Doc. #139.

[7] Plaintiffs added Vernon W. and Steven C. by way of Plaintiffs' First Amended Complaint dated March 30, 2010.  See Doc. #20.  Plaintiffs then sought to add Jason A. and Diane D. by way of a Motion to Intervene filed on April 7, 2010.  See Docket Entry 21.  Judge Beaty did not grant Plaintiffs' Motion to Intervene until May 19, 2010.  See Doc. #38.  Accordingly, although Plaintiffs' Renewed Motion for Preliminary Injunction indicates that Jason A. and Diane D. are parties, they had not yet been formally added to this action.

14, 2010), and, on May 12, 2010, denied the Renewed Motion to the extent Plaintiffs sought to prohibit implementation of the reimbursement rate reduction, but granted it "to the extent that Plaintiffs request that [Defendants] be required to ensure that Plaintiffs are provided with community-based treatment as an alternative to institutionalization during the pendency of this suit." Doc. #36 at 12-13.[8] Accordingly, Plaintiffs have lived in community settings under the effects of the reduced Supervised Living reimbursement rate during the pendency of this action.[9]

II.

Plaintiffs' claims arise under Title II of the ADA and Section 504 of the Rehabilitation Act. See Doc. #139, ¶¶ 101-43. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides: "No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794. These provisions impose the same requirements on Defendants. See Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013) ("We consider [the

---

[8] In subsequently granting Plaintiffs' Motion to Intervene, Judge Beaty specifically noted that the previously-entered preliminary injunction applied to Jason A. and Diane D. as well. See Doc. #38 at 5.

[9] As expounded on in Section III, the reduced Supervised Living reimbursement rate took effect at different times depending on the unique situations faced by Plaintiffs, and, in some cases, has been restored to a rate equal to, or exceeding, the reimbursement rates prior to February 2010.

plaintiffs'] Title II and section 504 claims together because these provisions impose the same integration requirements.") (citing <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261, 272 (2d Cir. 2003)); <u>Birmingham v. Omaha Sch. Dist.</u>, 220 F.3d 850, 856 (8th Cir. 2000) ("We have held that the enforcement, remedies, and rights are the same under both Title II of the ADA and § 504 of the Rehabilitation Act.").

In what is commonly referred to as the "integration mandate," regulations implementing Title II of the ADA require that a public entity administer its services in "the most integrated setting appropriate" to meet the needs of qualified individuals with disabilities. 28 C.F.R. § 35.130(d). Plaintiffs' claims regarding the February 2010 rate reduction to the Supervised Living reimbursement rate allege a violation of the integration mandate as addressed in <u>Olmstead v. L.C. ex rel. Zimring</u>, 527 U.S. 581 (1999). In <u>Olmstead</u>, the United States Supreme Court held that the unjustified institutionalization of individuals with disabilities is a form of discrimination under the ADA. <u>Id.</u> at 597. Although the plaintiffs in <u>Olmstead</u> resided in institutions at the time of filing suit and complained of the state's failure to provide services that would enable them to enter into the community, institutional placement is not a prerequisite to pursuing an <u>Olmstead</u> claim. <u>See</u> <u>Fisher v. Oklahoma Health Care Auth.</u>, 335 F.3d 1175, 1181 (10th Cir. 2003) ("[N]othing in the <u>Olmstead</u> decision supports a conclusion that institutionalization is a prerequisite to enforcement of the ADA's integration requirements."); <u>see also</u> <u>Pashby</u>, 709 F.3d at 322 (citing same). Rather, as in this case, community-based individuals may pursue a claim on the theory that a public entity's reduction or elimination of a necessary service places them at risk of institutionalization. <u>See, e.g.,</u>

Pashby, 709 F.3d at 322; Marlo M. ex. rel. Parris v. Cansler, 679 F. Supp. 2d 635, 637-38 (E.D.N.C. 2010).

At a basic level, this analysis is complicated by the need to consider what is an "institution" or an "institutionalization."[10]  "Nowhere in Title II, its implementing regulations, or in Olmstead is there a definition of what constitutes an 'institution' or 'community-based' setting." Disability Advocates, Inc. v. Paterson, 598 F. Supp. 2d 289, 320 (E.D.N.Y. 2009).  "While it is clear that, 'where appropriate for the patient, both the ADA and the [Rehabilitation Act] favor integrated, community-based treatment over institutionalization,' Olmstead and lower courts considering Olmstead claims have typically confronted situations in which the 'institutional' or 'community-based' nature of particular settings was not in dispute." Id. at 320-21 (quoting Frederick L. v. Department of Pub. Welfare, 364 F.3d 487, 491-92 (3d Cir. 2004)).

Here, however, whether hospitals, crisis respite centers, intermediate care facilities for the mentally retarded ("ICFMRs"), prisons, or large congregate facilities qualify as "institutions," and whether admissions/incarcerations of various lengths and for various reasons in those facilities qualify as "institutionalizations," is relevant to the inquiry, and it is necessary to give additional substance to those terms.  In examining various descriptions of "institutions" in this context, there is some consistency as to the defining

---

[10] The Parties agree that the large psychiatric hospitals and developmental centers maintained by the state of North Carolina qualify as institutions.  See 11/13/13 Tr. at 6:14-7:16; 11/13/13 Tr. at 50:24-51:3; see also N.C. Gen. Stat. § 122C-181.  The Parties also appear in agreement that the one-, two-, and three-person community placements in which Plaintiffs currently reside or have resided do not qualify as institutions.  See 11/13/13 Tr. at 51:4-13. There is, however, a vast gap between those opposite ends of the spectrum.

qualities. Plaintiffs' expert, Dr. James Bodfish,[11] testified to his view of institutions as follows:

> Those would be congregate settings, so very large living settings. Living with individuals who you don't choose to live with. Living primarily, if not exclusively within a disabled community as opposed to a non-disabled community.
> Institutional settings [are] also associated with diminished opportunity to be in greater proximity to have interactions with one's family.

9/24/13 Tr. at 187:14-22 (Dr. Bodfish). At least one district court decision analyzing qualities representative of an institution similarly focused on the size, isolation, segregation and lack of choice common to those facilities. See Disability Advocates, Inc. v. Paterson, 653 F. Supp. 2d 184, 199 (E.D.N.Y. 2009) ("The court uses the term 'institution' as defined by . . . one of [the plaintiffs'] experts, who explained that: '[An] [i]nstitution, in my mind, and in my experience, and in the literature, is a segregated setting for a large number of people that through its restrictive practices and its controls and individualization and independence limits a person's ability to interact with other people who do not have a similar disability."). Moreover, this view comports with proposed rules offered by the Centers for Medicare & Medicaid Services ("CMS"):

> We note that home and community-based settings do not include nursing facilities, institutions for mental diseases, intermediate care facilities for the mentally retarded, hospitals, or any other locations that have the qualities of an institutional setting as determined by the Secretary. In considering whether a setting has the qualities of an institutional setting, we will exercise a rebuttable presumption that a setting is not a home and

---

[11] Plaintiffs tendered, and the Court qualified, Dr. Bodfish as an expert generally in the care and treatment of individuals dually diagnosed with intellectual disabilities and mental illness and, more specifically, an expert in services and supports necessary to ensure successful community integration and to avoid unnecessary institutionalization for this population. See 9/24/13 Tr. at 157:13-19; 185:6-12.

community-based setting, and will engage in heightened scrutiny, for any setting that is located in a building that is also a publicly or privately operated facility that provides inpatient institutional treatment, or in a building on the grounds of, or immediately adjacent to, a public institution, or disability specific housing complex. . . . Other characteristics that could cause CMS to consider a setting as "institutional" or having the qualities of an institution would include, but not be limited to, settings which are isolated from the larger community, do not allow individuals to choose whether or with whom they share a room, limit individuals' freedom of choice on daily living experiences such as meals, visitors, and activities, or limit individuals' opportunities to pursue community activities.

Medicaid Program; State Plan Home and Community-Based Services, 5-Year Period for Waivers, Provider Payment Reassignment, and Setting Requirements for Community First Choice, 77 Fed. Reg. 26362-01, 26379 (proposed May 3, 2012).

Furthermore, in examining Olmstead and its progeny, it becomes clear that, although the term "institution" may commonly refer to a large number of general facilities in normal parlance, the "institutions" that are relevant to the instant action are facilities for the treatment of mental health and/or developmental disabilities. Indeed, as noted, Plaintiffs' claims spawn from the integration mandate of Title II of the ADA and its requirement that a public entity "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d) (emphasis added). At the heart of any such a claim is the argument that an individual is at "significant risk" of entering an "institution" because a lack of services in the community makes the "institution" the only facility sufficiently able to maintain the individual's health and safety. To hold, as Plaintiffs urge, that certain facilities not focused on providing mental health or developmental disability treatment, such as prisons, qualify as an "institution" for purposes of the instant claims loses sight of the regulatory

language and significant precedent that focus on where services are available.[12] Accordingly, for the purposes of applying the relevant standard in this context, an "institution" is a large, congregate facility for the treatment of mental health and/or developmental disabilities that exhibits qualities such as isolation, segregation and lack of personal choice and which is exemplified by the large, congregate facilities run by the state of North Carolina as defined in statutes and also by intermediate care facilities for the mentally retarded and hospitals.

However, not every admission to such a facility can be considered an "institutionalization." The length of admission and the reasons for the institutional placement must be considered. As an initial matter, it would seem clear that a hospital admission for a medical necessity unrelated to the mental health or developmental disabilities suffered by Plaintiffs is irrelevant to Plaintiffs' ADA and Rehabilitation Act claims. Similarly, a future risk of admission to a nursing facility for unrelated medical conditions would not weigh on Plaintiffs' claims.

As to length of admission, as Defendants' expert, Dr. Bonny Forrest,[13] noted in her Expert Report, there is a "need to separate out sporadic or brief

---

[12] Unlike the mental health or developmental disability institutions previously described, provision of services in a prison is incidental to an individual's otherwise being there for a criminal violation. Plaintiffs' argument that the state's provision of services is so deficient that it will likely lead to the incarceration of a person receiving such services is more in line with a negligence-based theory of liability and is not the subject of this action. Indeed, over the course of trial, Plaintiffs' evidence and arguments often blurred the lines between the ADA and Rehabilitation Act claims based on the rate reduction that were presented in the Complaint and that are at issue in this case with complaints regarding general inadequacy of services that would be more in line with a negligence-based theory of liability.

[13] Defendants tendered, and the Court qualified, Dr. Forrest as an expert in psychology, neuropsychology and the assessment and treatment and care of dually diagnosed individuals. See 10/28/13 Tr. at 44:15-18; 74:23-75:22.

periods of hospitalization or institutionalization, which are not unusual for this population, from situations that create the significant risk of long-term institutionalization." DX-33 at 14. In her Report, Dr. Forrest went on to describe the relevant issue as whether Plaintiffs are at risk "of being institutionalized long-term," id., and during the course of trial, she testified to a definition of institutionalization that involved placement in a facility without a plan to return to the community (see 10/30/13 Tr. at 157:15-17 (Dr. Forrest)). In a similar vein, Plaintiffs' expert, Dr. Bodfish, testified:

> In my opinion, risk of institutionalization refers to the risk that an individual, against their will, will be placed out of a community integrated setting, and will be living and receiving services in an institution or congregate setting.

9/24/13 Tr. at 191:4-8 (Dr. Bodfish) (emphasis added); see also 10/4/13 Tr. at 53:25-54:2 (Dr. Bodfish) ("In terms of my   my task, my final task in terms of risk of institutionalization, I would see that as a risk for a longer out of the home placement"). Moreover, in "Definitions relating to institutional status" (albeit in a section of the Code of Federal Regulations addressing "Federal Financial Participation") CMS has defined "[i]n an institution" as referring "to an individual who is admitted to live there and receive treatment or services there that are appropriate to his requirements." 42 C.F.R. § 435.1010 (emphasis added). Accordingly, the institutionalization at issue would focus on the long-term placement of an individual in an institution for the treatment of his/her mental health or developmental disability.

Simply demonstrating any risk of institutionalization is insufficient, however. The Department of Justice ("DOJ") - "the agency directed by Congress to issue regulations implementing Title II," Olmstead, 527 U.S. at 597-98 - determined that "the ADA and the Olmstead decision extend to

persons at <u>serious</u> risk of institutionalization or segregation," U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*, http://www.ada.gov/olmstead/q&a_olmstead.htm (last updated June 22, 2011) (emphasis added); <u>see also</u> <u>Olmstead</u>, 527 U.S. at 597-98 ("Because the [DOJ] is the agency directed by Congress to issue regulations implementing Title II, its views warrant respect." (citation omitted)). Courts addressing similar claims have used differing terminology to describe the level of risk of institutionalization necessary for a plaintiff to succeed on such a claim. <u>See, e.g.</u>, <u>M.R. v. Dreyfus</u>, 697 F.3d 706, 734 (9th Cir. 2012) ("We conclude that Plaintiffs have demonstrated a likelihood of irreparable injury because they have shown that reduced access to personal care services will place them at <u>serious</u> risk of institutionalization.") (emphasis added); <u>Marlo M.</u>, 679 F. Supp. 2d at 638 ("It appears that if forced from their present settings, both Plaintiffs face a <u>substantial</u> risk of institutionalization.") (emphasis added); <u>V.L. v. Wagner</u>, 669 F. Supp. 2d 1106, 1119 (N.D. Cal. 2009) ("Plaintiffs have submitted substantial evidence . . . showing that class members face a <u>severe</u> risk of institutionalization . . . .") (emphasis added). Recently, the United States Court of Appeals for the Fourth Circuit weighed in on the matter, when, in reviewing the granting of a preliminary injunction on similar claims, it held that, by demonstrating a "<u>significant</u> risk of institutionalization," the plaintiffs in that case had shown a likelihood of success on the merits. <u>Pashby</u>, 709 F.3d at 322 (emphasis added).

Given its applicability here, the <u>Pashby</u> decision warrants further attention. As an initial matter, despite the <u>Pashby</u> court's ultimate indication that the plaintiffs exhibited a likelihood of success on the merits through

declarations demonstrating a "significant risk" of institutionalization, the Pashby decision began its discussion of the law with the statement that it was "swayed by the DOJ's determination that the ADA and the Olmstead decision extend to persons at serious risk of institutionalization or segregation and are not limited to individuals currently in institutional or other segregated settings." Pashby, 709 F.3d at 322 (emphasis added) (internal quotation marks and citation omitted). There is no subsequent suggestion in the Pashby decision that the Fourth Circuit intended to substantively alter the standard espoused by the DOJ by replacing "serious" with "significant," and, accordingly, authority applying either terminology appears relevant to the inquiry necessary here. Moreover, in Pashby, with the exception of one cited declaration stating that the plaintiff "'will have no choice but to enter a facility,'" the declarations that the Fourth Circuit held demonstrated a "significant risk of institutionalization" were equivocal in that they stated the plaintiffs "'may,'" "'might,'" "'probably' would," or "were 'likely' to" enter an institution due to the termination of their in-home personal care services. Pashby, 709 F.3d at 322. The Pashby court, however, involved a class action and sat in a significantly different procedural posture than the instant matter in that it applied an abuse of discretion standard to the district court's decision on appeal. See id. at 319. Accordingly, it would read too much into the Fourth Circuit's holding to determine that Plaintiffs in the instant matter can demonstrate a "significant risk of institutionalization" by showing only that they "may" or "might," as opposed to "probably would" or "are likely to," enter an institution due to the reduction in the reimbursement rate that PBH pays for Supervised Living services.

The DOJ has provided some guidance on the applicable standard in stating that the risk need not be "imminent." See U.S. Dep't of Justice,

*Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*, http://www.ada.gov./olmstead/q&a_olmstead.htm (last updated June 22, 2011). "For example, a plaintiff could show sufficient risk of institutionalization to make out an *Olmstead* violation if a public entity's failure to provide community services or its cut to such services will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution." Id. There is, however, no simple formula to determine whether an individual is at "significant risk" of institutionalization. Indeed, the necessary inquiry is fact-intensive and is affected by numerous variables.

As it relates to the instant matter, the Parties' experts, whose qualifications leave no doubt as to their abilities in this field, set forth their own frameworks for assessing risk of institutionalization and how to determine whether that risk is significant. Defendants' expert, Dr. Forrest, opined that removal from a community setting is indicated where the individual poses an imminent danger to self or others, outpatient support has been unsuccessful in halting a psychiatric decompensation, or psychiatric issues or maladaptive behaviors have progressed to the point where that individual can no longer function in the community (see DX-33 at 13), and defined "significant risk of institutionalization" as a situation where, because of those factors, "facility placement is being (or is very likely to be) sought" (id.). Plaintiffs' expert, Dr. Bodfish, testified to a three-part test for determining risk of institutionalization: (1) "determining clinical characteristics of the individuals being evaluated" including "looking for the presence or absence of severe and persistent mental illness . . . [,] severe behavioral problems, severe medical conditions[, and] . . . the presence of psychotropic medications, in particular, complicated

prescription," 9/24/13 Tr. at 191:12-19 (Dr. Bodfish); (2) "evaluating the plan of care and the adequacy of the plan of care for . . . managing or treating those clinical conditions," id. at 192:2-4 (Dr. Bodfish); and (3) "looking for evidence that there is a mismatch, that the plan of care is not adequate[, such as] . . . [p]rotracted episodes of behavioral problems or psychiatric symptoms[,] [i]njuries to the individual or to the others around them[,] [n]eed to be placed in a hospitalization[,] [i]nvolvement with the police[, and] [s]taff changes or staff turnover for more difficult clients associated with that and then changes in the residence," id. at 193:3-12 (Dr. Bodfish). Thus, under this framework, a Plaintiff would be at risk of institutionalization when the plan of care cannot adequately manage his or her behaviors.

There is some merit to both experts' opinions as each addresses a slightly different aspect of the relevant inquiry. That is, in order to determine whether any of the six individual Plaintiffs here are at significant risk of institutionalization, the analysis requires, similar to what Dr. Bodfish sets out, examining the clinical characteristics of Plaintiffs and weighing those against the provider's ability to manage those characteristics. Any opinion as to this aspect is informed from the past three and a half years of biographical data presented during trial. In examining this information as a whole, of particular relevance are, as Dr. Forrest indicated, whether any of the Plaintiffs pose a danger to self or others, whether outpatient support has been unsuccessful in halting a psychiatric decompensation, or whether psychiatric issues or maladaptive behaviors have progressed to the point where that Plaintiff can no longer function in the community. Finally, in granting the DOJ the respect commensurate with its role as the agency issuing the regulations implementing Title II, the ultimate inquiry is whether the reduction in the Supervised Living

reimbursement rate has caused or "will likely cause a decline in health, safety, or welfare that would lead to the individual's eventual placement in an institution."  U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*, http://www.ada.gov./olmstead/q&a_olmstead.htm (last updated June 22, 2011).

Finally, for Plaintiffs to succeed on their claims, any significant risk of institutionalization must be causally related to PBH's Supervised Living reimbursement rate reduction.[14]  In giving some structure to the causation analysis, at least one court has applied tort concepts of proximate causation to the ADA and the Rehabilitation Act.  See Henrietta D. v. Bloomberg, 331 F.3d 261, 278-79 (2d Cir. 2003).  Although the Henrietta D. decision focused on explaining multiple causation, see id. at 279 n.8, because the instant action also addresses potential issues of multiple causation, as well as attributions of harm to only tangentially related events, application of proximate cause concepts is well-suited to the instant analysis as well.  Accordingly, the causation inquiry will focus on whether PBH's reduction to the Supervised

_____

[14] Generally speaking, "one of the only differences between claims under the ADA and the Rehabilitation Act is their standards for causation." Lamberson v. Pennsylvania, 561 F. App'x 201, 207 (3d Cir. 2014); see also Coursey v. University of Md. E. Shore, ___ F. App'x ___, ___, 2014 WL 2937084, at *6 (4th Cir. July 1, 2014).  "'The [Rehabilitation Act] allows a plaintiff to recover if he or she were deprived of an opportunity to participate in a program solely on the basis of disability, while the ADA covers discrimination on the basis of disability, even if there is another cause as well.'" Lamberson, 561 F. App'x at 207 (quoting C.G. v. Pennsylvania Dep't of Educ., 734 F.3d 229, 235-46 (3d Cir. 2013)).  This, however, is not the analysis of causation at issue here.  Given the nature of the claims, the question is rather whether the reimbursement rate reduction will likely cause the harm alleged, as opposed to whether the reimbursement rate reduction was imposed because of Plaintiffs' disabilities.  Accordingly, the application of traditional concepts of causation is appropriate.

Living service reimbursement rate is "substantially related" to Plaintiffs' significant risk of institutionalization, or "too remote or insignificant to the harm to be a legal basis for liability." Id. (internal quotation marks omitted). In other words, Plaintiffs cannot succeed on their claims merely by demonstrating that the Supervised Living reimbursement rate reduction led to some remote change unrelated to the service or reimbursement rate, but rather must demonstrate that a reduction in services itself led to the decline in Plaintiffs' health, safety, or welfare that would lead to Plaintiffs' eventual placement in an institution.

This framework will guide the analysis of each of the six Plaintiff's risk of institutionalization.

### III.

### A.

Plaintiff Diane D. represents "one of [PBH's] most difficult consumers by history." PX-67 at PBH010526. Her diagnoses include unspecified psychotic disorder, mild mental retardation, intermittent explosive disorder, scoliosis and Cohen syndrome. DX-348 at PBH011614.[15] Prior to the February 2010 rate reduction, Diane lived in a single-person placement in Davidson County operated by Monarch, Inc. ("Monarch") where she received 24-hour supervision consisting of a 2:1 staff to consumer ratio during the day and a 1:1 ratio of awake staffing at night. See PX-60 at PBH008114. At that time, PBH paid

---

[15] Certain documents classify Diane's mental health diagnosis as "schizoaffective disorder." See., e.g., PX-68 at PBH008076. Per the testimony of Ms. Covert, Diane's symptoms do not fall neatly into any category, making Diane difficult to classify. See 9/20/13 Tr. at 61:5-15 (Covert). With respect to Cohen syndrome, the National Institute of Health's website defines that condition as "an inherited disorder that affects many parts of the body and is characterized by developmental delay, intellectual disability, small head size (microcephaly), and weak muscle tone." Genetics Home Reference, Cohen syndrome, Nat'l Inst. of Health (January 2008), http://ghr.nlm.nih.gov/condition/cohen-syndrome (last visited Aug. 18, 2014).

Monarch a reimbursement rate of $250.00 per day for the provision of Diane's Supervised Living services. Id.

The February 2010 rate reduction remained in place for only a short period for Diane. In April 2010, the reimbursement rate PBH paid for Supervised Living services provided to Diane returned to the pre-rate reduction rate of $250.00 per day. See DX-292 at PBH009947. Moreover, an Enhanced Rate Request in June 2011 resulted in Diane's provider receiving a rate of $391.15 per day from PBH for providing Diane's Supervised Living services. See PX-37; PX-38; PX-63; see also DX-292 at PBH009958. Regardless, the direct impact of the February 2010 rate reduction was that it forced Diane from her single-person placement with a 2:1 staff to consumer ratio into a three-person congregate placement in May 2010 with a 2:3 staff to consumer ratio. PX-60 at PBH008114.

Since her move to a three-person placement, Diane has experienced incidents of physical and verbal aggression, medication refusals, police involvement and placements outside of the home, including a particularly tumultuous period in 2011. As to that 2011 period, in January 2011, one of Diane's housemates pressed charges against Diane after Diane, without warning, punched her in the arms and legs. DX-171 at PBH002138, PBH002140; DX-62. As a result, Diane spent a brief period in jail for simple assault. See 10/8/13 Tr. at 72:20-23; 10/31/13 Tr. at 26:12-17. On March 9, 2011, Diane's staff referred Diane to Frye Hospital for increased psychotic symptoms (DX-278), and Diane remained at Frye Hospital until April 5, 2011 (DX-277 at PBH008001). Immediately upon her return from Frye Hospital, Diane resumed "threatening behaviors toward staff and her housemate, verbal aggression, and physical aggression where she was pounding the walls, etc."

DX-277 at PBH008001. On April 6, 2011, Diane's direct care staff brought Diane to NC START crisis respite - a community-based placement that provides short term emergency respite stay to individuals in crisis situations in an effort to help those individuals avoid institutionalization (see 10/4/13 Tr. at 58:15-59:2 (Dr. Bodfish)). The following morning, however, NC START informed Diane's direct care staff that they were unable to handle Diane's behaviors and asked that staff return to pick her up. DX-277 at PBH008001. During this same period, staff reflected that "it is very difficult for them to manage Diane." Id. On June 29, 2011, Diane's treatment team requested a reimbursement rate of $391.15 per day for providing Diane's supervised living services (see PX-63; PX-64), noting that, "without additional supports and funding[,] Diane would not be able to maintain living in her community" (PX-64 at PBH008110). Shortly thereafter, in July 2011, Monarch's qualified professional for Diane's placement, who is the supervisor for Diane's direct care staff, sent emails to her own supervisors and to healthcare professionals with Monarch seeking assistance with Diane's treatment and noting that she "is at a total loss" as to how to handle Diane's behaviors and that they are "facing health issues on top of safety issues for Diane as well as her housemates." DX-480 at DDM00736.

Although Diane's behaviors subsequently dissipated to some extent, they did not cease after 2011. For example, on January 22, 2012, Diane's staff took her to Lexington Medical Center for behavioral issues including "unusual behavior and suicidal thoughts." DX-84 at DDOT00003. And, even during the course of trial, Diane exhibited behavioral concerns warranting renewed attention. That is, in the latter half of October 2013, Diane's treatment team noted that Diane "started to decompensate." DX-919 at PBH012266. In addition to "falling and refusing to get up from the floor more frequently,"

"refus[ing] to go to her day activity," and "demonstrat[ing] headbanging" (id.), the Executive Director of Diane's then-current service provider, Elite Care Services, Inc. ("Elite Care"), observed Diane eating her own feces (id.; 11/5/13 Tr. at 104:6-12 (Bennet)).

Although there is a gap in documented behavioral incidents from late 2012 to mid-2013, Diane's longest placement outside of her home in the post-rate reduction period occurred during this time. Specifically, on November 21, 2012, after several attempts to stand from a seated position at the edge of her bed, Diane fell onto the floor of her community placement. PX-48 at DDM07537. She remained on the floor for nearly 24 hours before her direct care staff sought emergency medical assistance and hospitalization. See id. at DDM07537 - DDM07539. Subsequent x-rays taken at Lexington Medical Center revealed severe end-stage osteoarthritis of Diane's knees. DX-90 at DDOT00058. According to the Lexington Medical Center Discharge Summary, after observing that Diane was unable to stand even briefly without severe pain, "it was determined [Diane] would no longer be able to reside in her group home and would benefit with being placed in a skilled nursing facility." Id. Accordingly, Diane went to "UPAC" for rehabilitation.[16]

Diane's subsequent departure from UPAC was affected by the recommendations of her physician, which also resulted in a change in providers. On January 11, 2013, Diane's treating physician at UPAC, Dr. Thomas-Slade, issued a form referred to as an "FL-2" recommending continued skilled nursing

---

[16] Although UPAC was identified as a skilled nursing facility, the full name of UPAC was not clarified during trial. However, certain of the documents in evidence refer to UPAC as "Unihealth PAC in High Point," see, e.g., PX-59 at PBH012062, and, accordingly, it would appear that UPAC refers to UniHealth Post-Acute Care - High Point.

facility level of care for Diane.  <u>See</u> PX-52 at PBH012136.  In an apparent response to that recommendation, on January 21, 2013, Diane's then-current provider, Monarch, issued a letter to Diane's guardian noting that it "does not provide nursing level of care and therefore must issue notification of immediate discharge from residential services."  PX-49 at DDM07509.  That letter continued: "It is most important for Diane to live somewhere that can accommodate all of her needs and ensure her health and safety at the level of care determined in her assessments."  <u>Id.</u>  A subsequent FL-2, dated January 29, 2013, recommended "Other: Custodial Care" for Diane (<u>see</u> PX-52 at PBH012137) - a level of care not recognized by PBH (<u>see</u> 9/24/13 Tr. at 62:14-63:22 (Jennings); 110:6-18 (Jennings)).  Three more FL-2s followed - one dated February 25, 2013, failing to provide a recommendation for Diane's care (<u>see</u> PX-52 at PBH012138), another dated February 25, 2013, recommending "Assisted Living" (<u>see</u> PX-52 at PBH012139), and one dated May 3, 2013, again recommending "Assisted Living" (<u>see</u> PX-51 at PBH012135) - before Dr. Thomas-Slade issued an FL-2 on May 22, 2013, recommending that Diane return to a group home (<u>see</u> PX-53 at PBH012140).  On May 27, 2013, Diane moved into a three-person group home operated by Elite Care.  <u>See</u> PX-59 at PBH012062.  Almost immediately, Elite Care indicated that it had underestimated Diane's needs (<u>see</u> PX-59 at PBH012064) and, shortly thereafter, moved Diane to another home it operated where, as of the most recent information presented during trial, Diane currently resides with one male and one female housemate (<u>see</u> 11/5/13 Tr. at 140:13-142:4 (Bennett); 101:7-102:6 (Bennett)).

Although Diane's post-rate reduction behaviors are concerning, they are similar to Diane's pre-February 2010 behaviors.  An April 10, 2008, note from

Daymark Recovery Services ("Daymark"), a provider of medical and professional mental health treatment, indicates that "[s]taff encouraged [Diane] to open up and tell [her psychiatrist] that she has been having more problems with her explosive anger behavior." DX-894 at DDM07185. It describes "an episode where [Diane] locked herself in the car and the police had to be called. When she got home, she started throwing things, turned over the entertainment center, wiped things off the counter and threw her hamster across the room." Id. On June 10, 2008, a follow-up note from Daymark noted that Diane "ha[d] been involuntarily hospitalized twice" in the previous two months. Id. at DDM07183. It elaborates: "Apparently, she was not taking her medications and she was having escalating aggressive behavior, destroying things and allegedly saying that voices were telling her to do these things." Id. Diane spent June 24, 2008 to August 18, 2008, September 30, 2008 to October 8, 2008, and October 11, 2008 to December 9, 2008, in jail for separate episodes of assault and communicating threats. See DX-471; DX-472; DX-473. A psychological evaluation conducted on January 28, 2009, noted Diane's "extreme behavioral issues, which include: physical aggression; property destruction/tantrumming; self-injurious behavior; and[] elopement." DX-270 at PBH007740. Of note, that same assessment concluded with the following recommendation:

> Consider group home placement with people her own age and functioning level. [Diane] is very isolated in her own home, particularly when she refuses community outings. Having a few other peers in your home can provide opportunities for social interaction, friendships and immediate feedback from someone your own age and not staff. Peers can be positive role models for [Diane] in terms of getting up, going to work, having fun and appropriate behavior in general. The positives outweigh the negatives at this time. Her current isolation does not appear to be helpful in addressing many of her needs.

Id. at PBH007748.

The Parties' experts - each of whom conducted an initial Report in 2011, a Supplemental Report in 2013, and, specifically with respect to Diane, testified regarding a final opinion on risk after examining behaviors arising during the course of trial - came to opposite conclusions with respect to Diane's risk of institutionalization. Defendants' expert, Dr. Forrest, concluded at the time of her initial Report, dated October 30, 2011, that Diane was not at risk of institutionalization (see DX-33 at 40), and, at the time of her Supplemental Report, dated May 30, 2013, that "[t]he February 2010 rate reduction has not caused a reduction in services that places Diane at a greater risk of institutionalization than she was prior to the rate reduction" (see DX-34 at 11). In contrast, Plaintiffs' expert, Dr. Bodfish, concluded in his September 30, 2011 initial Report, that Diane was "currently at significant risk for institutionalization," that her "current situation is immanently [sic] dangerous for her and for those around her," and that "her current decompensation and increased risk for institutionalization is most likely causally related to the recent changes in her living situation." PX-184 at D5-D6.[17] At the time of his Supplemental Report, dated July 17, 2013, Dr. Bodfish further concluded that "Diane's risk of institutionalization ha[d] significantly increased relative to the time period of [his] last evaluation of her." PX-185 at D1. Finally, at trial, after

---

[17] Because Dr. Bodfish's Reports were unnumbered, during the course of trial, the Court adopted a numbering system by which the section of the relevant Report is indicated by the appropriate Plaintiff's initial, followed by the specific page number. Thus, for example, "PX-184 at D6" refers to page 6 of Dr. Bodfish's section on Diane as found in Plaintiffs' Exhibit No. 184. Where multiple Plaintiffs are addressed on the same page, that is reflected accordingly. For example, in Dr. Bodfish's Supplemental Report, where the second page of Clinton's section is also the first page of the section addressing Diane, that page is "C2 D1."

review of Diane's most recent behaviors, Dr. Bodfish testified that he didn't think Diane's risk of institutionalization "could be any higher." 11/8/13 Tr. at 23:20-21 (Dr. Bodfish).

While the Parties' experts agreed that a comparison of a simple count of behaviors pre- and post-reimbursement rate reduction would be both inadequate and likely infeasible (see 10/4/13 Tr. at 78:9-79:8 (Dr. Bodfish); 10/28/13 Tr. at 143:7-10, 218:4-6 (Dr. Forrest)), they settled on differing methods to develop, or at least to support, their opinions of risk of institutionalization. In conducting his initial evaluation, Dr. Bodfish observed and interacted with each of the Plaintiffs on one occasion, where available, spoke with their guardian and/or a care provider, and, finally, reviewed the documentation provided to him by Plaintiffs' counsel. See 9/24/13 Tr. at 199:20-200:13 (Dr. Bodfish). For his supplemental review, Dr. Bodfish, per the resolution of a discovery dispute between the Parties, relied on a review of documents.[18] With this information,

---

[18] During the initial course of discovery, both experts were afforded the opportunity to evaluate and interview Plaintiffs and their providers in person in addition to reviewing Plaintiffs' healthcare records. See Doc. #111 at 2. Those in-person evaluations and discussions occurred in fall 2011. In early 2013, Defendants sought consent from Plaintiffs to conduct further in-person discussions with Plaintiffs' healthcare providers on the grounds that "there is a significant difference between what can be gleaned from a review of written clinical records versus also having direct conversations with healthcare providers." Doc. #105, ¶ 13. Plaintiffs declined that consent. See id., ¶ 11. On April 29, 2013, Defendants filed a Motion to Compel, moving the Court to allow Dr. Forrest to be able to speak with Plaintiffs' providers in order to adequately update her expert opinions. See Doc. #105. Plaintiffs opposed that Motion on the grounds that "(a) the proposed site visits . . . could take weeks and require dozens of attorney hours and hundred of dollars in travel expenses; (b) if Dr. Forrest were to substantially revise her report or opinions in light of data recently obtained, Plaintiffs' expert would need an opportunity to do likewise; and (c) reopening expert discovery would likely require a second deposition of each expert witness and lead to a delay of trial." See Doc. #106 at 3. Defendants' Motion was denied, see Docket Entry dated 5/10/2013, Doc. #111, restricting both Parties' experts to a 'paper review' of Plaintiffs' records with which to supplement their initial Reports. Accordingly, neither expert has

(continued...)

Dr. Bodfish simply relayed his impression of each of the Plaintiff's risk of institutionalization and the cause of that risk.

This approach, however, raised some concerns.  Dr. Bodfish's apparent lack of knowledge of the underlying facts, as evidenced by his testimony, raised serious questions regarding the weight his opinions warrant, especially to the extent they address causation.  For example, where Dr. Bodfish testified that Diane's pre-rate reduction period "was a period of stability, success for her" (10/9/13 Tr. at 20:16-21:13 (Dr. Bodfish)), he acknowledged that he had not spoken with anyone who had known Diane prior to her move caused by the rate reduction, including Diane's guardian.  Instead, he had relied on statements made by that guardian to Plaintiffs' counsel (see id. at 20:16-25 (Dr. Bodfish)). When presented with specific examples of pre-rate reduction behaviors and provider discharges, including hospitalizations, incarcerations, and numerous serious behavioral events described in the documentary evidence, Dr. Bodfish exhibited only a vague familiarity with those incidents.  See, e.g., id. at 21:6-42:21 (Dr. Bodfish).

Along these same lines, Dr. Bodfish seemingly attributed every negative event that followed the reimbursement rate reduction to a mismatch in the plan of care caused by the rate reduction without regard to, and seemingly without conducting further inquiry into, whether said event was related to the plan of care at all, much less the more specific Supervised Living service central to this action.  For instance, Dr. Bodfish highlighted Diane's out-of-home UPAC placement as an indicator of increased risk caused by the reimbursement rate reduction with little knowledge of the reasons Diane entered UPAC.  See

---

[18](...continued)
evaluated Plaintiffs in person since fall 2011.

10/8/13 Tr. at 151:4-11 (Dr. Bodfish); 152:13-23 (Dr. Bodfish). That is, despite evidence that Diane's UPAC placement was a result of needed rehabilitation for end-stage osteoarthritis, Dr. Bodfish testified that he saw it "as part of a chain of events that happened after [the rate reduction]" (id. at 153:19-20 (Dr. Bodfish)) and opined that "if [Diane] weren't demonstrating that pattern of behaviors at all, there would be no need for her to go to UPAC" (id. at 155:21-23 (Dr. Bodfish)). Similarly, Dr. Bodfish highlighted Monarch's discharge of Diane during this time period, which he described in his Report as "a result of increasing and persistent behavioral decompensation" (PX-185 at C2 D1), as evidence of the ill-effects of the reimbursement rate reduction. However, Monarch's own discharge notice provides only that said discharge was a result of Diane's treating physician at UPAC recommending a level of care that Monarch did not provide (see PX-49), and Dr. Bodfish offered no reasons to call Monarch's stated reasons for its discharge into doubt. When asked to review Monarch's discharge notice, Dr. Bodfish expressed that he did not believe Diane needed a skilled nursing level facility (see 10/8/13 Tr. at 158:2-5 (Dr. Bodfish)) and that any rehabilitation could be done in a community setting (see id. at 161:15-19 (Dr. Bodfish)) despite his apparent lack of knowledge of Diane's underlying medical concerns, or even the recommended level of rehabilitation (see id. at 158:8-15 (Dr. Bodfish)), and the fact that Dr. Bodfish is not a medical doctor (see id. at 158:16-17 (Dr. Bodfish)).

Dr. Forrest applied a somewhat different approach. For her initial Report, Dr. Forrest evaluated each of the Plaintiffs at least twice, attempting to make one visit at a home placement and one in the community, if appropriate (see 10/28/13 Tr. at 115:19-116:2 (Dr. Forrest); DX-33 at 4). Moreover, Dr. Forrest testified that she requested every document for review as opposed to

allowing Defendants' counsel to make a selection of documents for her. See 10/28/13 Tr. at 80:6-12 (Dr. Forrest). Finally, Dr. Forrest appears to have attempted to speak with as many individuals available to her as possible. As for her Supplemental Report, like Dr. Bodfish, and as a result of the resolution of the previously-noted discovery dispute between the Parties, Dr. Forrest relied on documentary evidence, although Dr. Forrest also continued to speak to as many individuals available to her to the extent she could without violating the resolution of the Parties' discovery dispute. To support her interpretation of this data as a whole, Dr. Forrest attempted to apply three objective measures. The first, the Aberrant Behavior Checklist, involved a survey, completed by a person familiar with the behaviors of the Plaintiff, which was then scored and normalized as closely as possible against the target population to determine whether Plaintiffs exhibit certain types of behaviors at a clinically significant level. See 10/28/13 Tr. at 128:23-131:11 (Dr. Forrest).[19] The second was the Adaptive Behavior Assessment System-II - a scale used to measure, as Dr. Forrest explained, "the social, the practical and conceptual skills that you need to navigate your world on daily basis." Id. 135:5-7 (Dr. Forrest). Lastly, at the time of her Supplemental Report, restricted with respect to her access to Plaintiffs or their providers and thus her ability to use her previously-applied

---

[19] Although the Aberrant Behavior Checklist gives a range of scores in behavior categories including "Irritability," "Lethargy," "Stereotypy," "Hyperactivity," and "Inappropriate Speech," Dr. Forrest testified that she interpreted just the Irritability scale as relevant to Plaintiffs' risk of institutionalization, and, even more specifically, a question on the checklist relevant to the Irritability scale designed to account for Plaintiffs' level of aggression. See 10/28/13 Tr. at 113:3-24. According to Dr. Forrest, she made this decision based on her assessment that the Irritability scale would most likely capture the behaviors relevant to a risk of institutionalization as drawn from her review of relevant literature. See id.; see also id. at 123:10-12 ("[T]he single best predictor of challenging behavior is what we talked about aggression.").

indicators again for purposes of a direct comparison at two points in time, Dr. Forrest instead looked to a measure already applied by PBH - the Supports Intensity Scale - which PBH had completed prior to the rate reduction and at a time closer to trial for all Plaintiffs except for Diane. See id. at 139:18-140:20 (Dr. Forrest).

This, however, is not to say that Dr. Forrest's opinion was free from concern, though those concerns were minor in comparison. Where Dr. Bodfish appeared inclined to attribute every potentially negative post-February 2010 event to the reimbursement rate reduction, Dr. Forrest seemingly hesitated at times to attribute arguably negative outcomes to the rate reduction. For example, Dr. Forrest described Diane's move into the three-person group as resulting from Diane's then almost year-old January 2009 psychological assessment recommending congregate living instead of as a result of the reimbursement rate reduction. Dr. Forrest did so despite documentation that budgetary issues more directly precipitated that transition and despite the fact that individuals intimately involved in Diane's care saw the move as likely negative. See 10/31/13 Tr. at 67:4-68:13 (Dr. Forrest). Indeed, Dr. Forrest's seemingly positive view of this move aligned with her expressed belief that individual placements are isolating in comparison to more congregate facilities that allow additional opportunity for growth through increased social integration (see id. at 14:23-15:11 (Dr. Forrest); 23:7-11 (Dr. Forrest)). Moreover, as evidenced more clearly in her analysis of other Plaintiffs, where Dr. Forrest's objective scales did not support her own conclusions regarding risk of institutionalization, particularly with respect to the Aberrant Behavior Checklist, she at times downplayed those contradictory scores as resulting from deficiencies on the part of the caretaker or guardian who completed the survey

(see, e.g., id. at 145:23-146:19 (Dr. Forrest); 10/29/13 Tr. at 8:1-9:9 (Dr. Forrest)) - an effort Plaintiffs seemingly highlighted as a demonstration of bias.

Regardless, Dr. Forrest's opinion as a whole, including specifically with respect to Diane, presented as one founded on a more thorough and detailed evaluation of Plaintiffs, and, indeed, better supported by the evidence, than did Dr. Bodfish's. In each instance, including those where Dr. Forrest adopted her own clinical judgment in the face of somewhat contradictory objective scores, her conclusions were well supported and withstood scrutiny. In contrast to Dr. Bodfish's testimony, which raised questions regarding his knowledge of the underlying facts on which he based his conclusion, Dr. Forrest conducted an exhaustive evaluation into the lives of each Plaintiff - at least to the extent possible in the course of the current litigation.

On this showing, Plaintiffs have failed to demonstrate that Diane is at significant risk of institutionalization generally or that the Supervised Living reimbursement rate reduction specifically "will likely cause a decline in health, safety, or welfare that would lead to [Diane's] eventual placement in an institution," U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*, http://www.ada.gov./olmstead/ q&a_olmstead.htm (last updated June 22, 2011). All Plaintiffs are at some risk of institutionalization by the very nature of their underlying conditions and difficult pasts, and, of them, Diane's risk of institutionalization comes closest to warranting the label of "significant." However, the evidence remains insufficient to draw that conclusion. Although Diane continues to exhibit concerning behavior, there is insufficient evidence that those behaviors have progressed to the point where she can no longer function in the community,

-30-

that her health, safety or welfare have declined, or that such is the trend. Even with respect to Diane's behaviors that arose during trial, and specifically as to eating her own feces, although alarming in nature, such behavior is not inherently dangerous. <u>See</u> 11/8/13 at 49:9-50:4 (Dr. Bodfish); 51:7-14 (Dr. Bodfish). Moreover, to the extent an analysis of whether Diane can continue to be maintained in the community is informed by past experiences, it is of some significance that Diane's most recent behaviors are an improvement from those she exhibited in early 2011, and, even at that time, Diane's providers were able to avoid long-term institutional placement.[20]

Perhaps even more damaging to Plaintiffs' claim, however, is the lack of demonstrated causation between the Supervised Living reimbursement rate reduction and Diane's behaviors. That is, even if it were concluded that Diane is at significant risk of institutionalization, no basis exists to conclude that the Supervised Living rate reduction affected that risk. Plaintiffs have been unable to connect any of Diane's behaviors to the reduced staffing ratio or the presence of additional housemates caused by the Supervised Living reimbursement rate reduction. Moreover, there is no discernable distinction between Diane's pre- and post-reimbursement rate reduction behaviors. In the face of more than three years of Diane's behaviors that seemingly do not depart from those she exhibited prior to the rate reduction, hypothesized deleterious effects carry little weight.

---

[20] Although there was some suggestion by Plaintiffs and Dr. Bodfish that Diane's ability to avoid institutionalization throughout the post-rate reduction period is owed in no small part to the effect of the preliminary injunction, Plaintiffs have offered no evidence that the preliminary injunction played any likely role in PBH's decisions regarding Diane's care and/or placement.

B.

Plaintiff Timothy B.'s diagnoses include unspecified psychotic disorder, adjustment disorder, diabetes, glaucoma, severe mental retardation, epilepsy, and deafness. PX-1 at PBH006065. In addition, Timothy is non-verbal and communicates through a combination of American Sign Language ("ASL") and "home signs" - i.e., signs unique to Timothy that are not recognized in ASL. A 2009 psychological assessment estimated Timothy's IQ at 30 - placing him in the lowest one percent of the population. PX-1 at PBH006066; 11/1/13 Tr. at 169:2-170:25 (Dr. Forrest); 10/1/13 Tr. at 89:7-11 (Dr. Bodfish).[21] Indeed, Timothy is among the lowest cognitive functioning, if not the lowest, of Plaintiffs. See 10/1/13 Tr. at 90:7-13 (Dr. Bodfish). Prior to the February 2010 reimbursement rate reduction, Timothy lived alone in an apartment in Raleigh, North Carolina, where he received 1:1 staffing during the day and 1:1 awake staffing during the night. His provider at the time, Community Alternatives North Carolina Southeast ("Community Alternatives"), received a reimbursement rate of $250.00 per day for the provision of Timothy's Supervised Living services. PX-22 at PBH006106; DX-691 at PBH010187.

On January 15, 2010, Community Alternatives informed Rose B., Timothy's mother and guardian, that, effective April 15, 2010, it would no longer be able to provide services to Timothy in his current living situation under the reduced Supervised Living reimbursement rate. See DX-691 at

_____

[21] Specifically, the 2009 psychological assessment listed Timothy's "Full IQ" as "30," and, under "Percentile," listed "<0.1". PX-1 at PBH006066. Dr. Bodfish testified that this indicated Timothy is "functioning at a level less than 1 percent of the population." 10/1/13 Tr. at 89:9-11 (emphasis added). Dr. Forrest, in response to the question whether this indicated that Timothy "is in the percentile of less than 1/10 of 1 percent of his peers, that being men in their mid-forties," responded "[i]t does." 11/1/13 Tr. at 170:4-8 (Dr. Forrest). This distinction is immaterial.

PBH010187. In addition, according to the testimony of PBH's Regional Executive Director, Anna Yon, new interpretations of currently existing regulations meant that PBH could no longer serve Timothy in his Raleigh placement because it was outside of PBH's catchment area. See 10/10/13 Tr. at 92:1-93:22 (Yon). PBH began exploring two options for Timothy: (1) moving Timothy into PBH's catchment area; or (2) transferring responsibility for Timothy's care to the LME that served Wake County. See id. at 93:23-97:19 (Yon). Recognizing the need to find a new placement in a relatively short period of time, on February 12, 2010, Paula Clements, a support coordinator with People Driven Supports ("PDS"), a division of PBH, sent a letter to Rose informing her of potential options. See PX-31. Rose, however, hopeful that the instant litigation would resolve the issue, and interested in only single-person placements for Timothy, delayed making a decision on Timothy's placement.

On April 9, 2010, PBH extended the pre-rate reduction rate paid for Timothy's Supervised Living services to April 30, 2010, giving a short extension to the period Timothy could remain in Raleigh. DX-17 at 3. Even with this extension, it was only four to five days before the new deadline when Rose informed PBH that she had made the decision to bring Timothy back to Davidson County. See 10/10/13 Tr. at 104:1-18 (Yon); DX-666 at PBH006715; PX-32 at PBH006708. PBH located and provided options for Timothy's placement in PBH's catchment area to Rose, who, as Timothy's guardian, was responsible for making the ultimate decision regarding Timothy's placement. Included among those options was a group home with a deaf resident and staff ready to work with another deaf consumer, but Rose "went back and forth with this suggestion and [] indicated she did not want Timothy in a group home setting." PX-32 at PBH006709; see also 10/10/13 Tr. at

-33-

104:24-105:8 (Yon). As of April 30, 2010, Rose had not finalized a placement for Timothy. See 10/10/13 Tr. at 109:2-9 (Yon). PBH arranged for Timothy to reside at respite for 30 days to allow Rose additional time to decide on a placement (see id. at 109:12-23 (Yon)), but, on the day Timothy was leaving Raleigh, Rose decided instead to bring Timothy to reside with her and Timothy's father (see id. at 110:2-7 (Yon); see also id. at 110:13-25 (Yon)).

At his parents' home, Timothy exhibited a number of behaviors that Rose struggled to manage. DX-651 at PBH006616. As Rose described it:

> And then after we kept him from April to I think it was June, it got pretty bad. Timothy [] was very upset when he had to leave Raleigh and he give [sic] us a run for our money those months. I mean we really went through some terrible behavioral problems.

9/10/13 Tr. at 77:7-11 (Rose B.). Realizing that caring for Timothy and the medical needs of Timothy's father, who had just had heart surgery, were too much, Rose sought a different placement for Timothy. PX-18 at PBH006222; DX-651 at PBH006616. In June 2010, Timothy moved into a two-person residential placement operated by Ambleside (PX-18 at PBH006222) - a placement not offered by PBH, but identified and chosen by Rose after conversations with caretakers who supported Timothy while he lived with his parents (10/10/13 Tr. at 111:17-112:21 (Yon)).

Timothy's period in the two-person placement was replete with behavioral incidents as displayed by the multiple DHHS Incident and Death Reports ("Incident Reports") that span 2010 and 2011. See generally PX-194. Those incidents often involved property destruction in the form of pulling down blinds and curtains (see id. at TBAS00875, TBAS00881, TBAS00915, TBAS00954) hitting and sometimes breaking windows (see id. at TBAS00887, TBAS00903, TBAS00942, TBAS01008), and knocking over the television (see id. at

TBAS00881, TBAS00996, TBAS01000). In addition, Timothy exhibited physical aggression in the form of hitting and biting staff and his fellow housemate (see id. at TBAS00907, TBAS00930, TBAS00954, TBAS00958). Several of these incidents resulted in personal injury (see id. at TBAS00903, TBAS00907, TBAS00930, TBAS00942, TBAS00958, TBAS00972, TBAS1052) and police involvement in the form of assistance to handle Timothy during particularly aggressive outbursts (see id. at TBAS00930, TBAS01052).

At the height of these behaviors, in August 2011, Timothy engaged in a physical altercation with Rose during an orthopedist appointment, and, immediately thereafter, staff sought to have Timothy involuntarily committed due to a cumulation of physical aggression, property destruction and medication refusals that they were unable to control. See DX-306 at PBH010987. Rose reported at the time that Timothy "ha[d] not slept the past 24 hours [and] ha[d] refused to take his medications." Id. Moreover, Rose "state[d] that she followed up with Ms[.] Parker the group home manager [], and that they were very concerned that [Timothy] was aggressive to the extent (verbally, ongoing and intense gestures, property destruction, refusal to eat, and take medications) that they felt he needed some emergency intervention." Id.

A Daymark Progress Note from August 3, 2011, regarding that potential involuntary commitment states: "Patient's mother [Rose] calls and reports the patient, 'is in withdrawal from that Xanax.' She says the patient has had increased behavioral outbursts since he took the last Xanax on Saturday. She said she went to the 'foot doctor and he has tried to fight all of us.'" DX-460 at 1. In the "Description of Intervention" section, that Note continues: "Discussed with mom the problems we have had starting and stopping meds

and that this recent change was per her request." Id. A day later, on August 4, 2011, another Daymark Note provides:

> [Timothy's] [p]arents continue to be somewhat difficult and uncooperative to deal with. They do not want [Timothy] to go to the hospital but recognize that they cannot manage him and somehow think the group home staff should manage him. They do not want him all doped up but then states [sic] he needs a 'behavior medicine.' They were upset that he was handcuffed. They do not want him going to Broughton but after discussion are willing for him to be hospitalized somewhere. . . . I believe he did benefit from low dose benzos but family felt that made him too ataxic. Group home staff and I did not think it made him that ataxic. At any rate, he needs to be stabilized as an inpatient so involuntary papers were taken out.

Id. at 4.

Indeed, Rose's intervention in Timothy's care, especially her desire to remove Timothy from his psychotropic medications - a desire driven by concerns regarding over-medication often not shared by staff or treatment professionals - is a consistent theme in Timothy's life. A December 1, 2012, Progress Note indicates concern by Rose that Valium may be affecting Timothy's gait. See PX-13 at PBH011149. Likewise, a December 9, 2012, Progress Note documents Rose expressing concerns that Timothy's psychotropic medications were affecting Timothy's gait and mobility and making him lethargic despite Timothy's care coordinator's impression that "Timothy is not lethargic, responds very well to others around him, is more alert to his surroundings, and is much more happier as he is not always angry and engaging in property destruction and physical aggression that not only puts his health and safety at risk but others." Id. at PBH011154.[22] Per a December 15, 2011, Progress Note, Rose indicated that "she is not happy with the

---

[22] A care coordinator is an employee of PBH who serves as a liaison, or point person, for the consumer and his or her guardian. See, e.g., 10/10/13 Tr. at 41:21-44:4.

psychotropic medications, however [she] opted not to go to the [psychiatry] appointment as she knows the group home manager Ms Parker is going to tell the psychiatrist has [sic] improved Timothy's behaviors." Id. at PBH011162. Later, as noted in a December 19, 2011, Progress Note, Rose indicated that "she and her husband are going to start Timothy with a new neurologist, and that if they like him, they may let this physician prescribe both medications for seizures and Timothy's behaviors" and that "she is not happy with either Timothy's seizure or behavioral medications and feel they may be impacting his gait." Id. at PBH011164. A subsequent Progress Note recounts that, in response to this suggestion by Rose, Timothy's care coordinator asserted that "the team and providers will be concerned if Timothys' [sic] resorts back to behaviors, when [they] have experienced an extended period of time where Timothy has had a significant decrease in aggressive behaviors and is functioning adequately in all of his settings." Id. at PBH011170. Regardless, Rose continued with the neurologist appointment and indicated a desire that Ms. Parker, the manager of Timothy's group home, not attend, an apparent effort to prevent Ms. Parker from asserting an opinion contrary to her own. Id. at PBH011165.

Rose has also consistently expressed concerns over staff's inability to effectively communicate with Timothy - both before and after the February 2010 reimbursement rate reduction. A September 17, 2009, Progress Note indicates that Rose felt Timothy's behaviors were increasing and that "this can be related to communication (staff - inability to communicate with [Timothy] and understand his needs)." DX-248 at PBH006890. Similarly, an October 5, 2009 Progress Note describes Rose's concerns that "the Community Alternative staff, are not fully trained to communicate or to address Timothy's

behaviors as she feels they should be able too [sic]." DX-247 at PBH006877.
Rose's views as to the correlation between Timothy's behaviors and staff's
ability to communicate with Timothy appear to reflect her own belief of
Timothy's ability to communicate through ASL. When asked whether she
agreed with a 2010 Psychological Consultation Report, conducted by a Ph.D.
level psychiatrist who is deaf and communicates using ASL (see 9/11/13 Tr. at
74:9-14 (Dr. Morganstein)), that described Timothy's signs and stories as
"frequently unclear, lack[ing] fluency, and demonstrat[ing] a limited vocabulary
or knowledge of sign language" (9/10/13 Tr. at 139:21-140:2 (Rose B.); PX-24
at PBH006045), Rose, although admitting that she is not proficient in ASL (see
9/10/13 Tr. at 140:13-14 (Rose B.)), responded that she did not agree
"[b]ecause [she] know[s] Tim[othy] knows his ASL" (id. at 140:3-7 (Rose B.)).

In 2013, as a result of Rose's complaints regarding the condition of
Timothy's group home (see PX-13 at PBH011174; 11/4/13 Tr. at 150:9-11 (Dr.
Forrest); see also 9/10/13 Tr. at 90:14-20 (Rose B.)), Timothy moved into a
single-person apartment where, as of the most recent information provided
during trial, he continues to receive services from Ambleside (9/10/13 Tr. at
109:21-110:14 (Rose B.)). He receives 24-hour 1:1 staffing, including awake
staffing at night. Id. Thus, as of the most recent information presented during
trial, Timothy currently resides in substantially the same circumstances as he
did prior to the February 2010 reimbursement rate reduction.

Not only is Timothy's living situation similar, but Timothy's post-
reimbursement rate reduction behaviors are also similar to those he exhibited
pre-February 2010. Indeed, as Rose testified, Timothy "has always had
behavioral problems, and . . . [Timothy] will always have behavioral problems."
9/10/13 Tr. at 60:14-16 (Rose B.). As noted in Timothy's Individual Support

Plan for December 1, 2008, to November 30, 2009, "Timothy [] had several inappropriate behaviors over the past year. The behaviors have occurred when Timothy was upset about not getting his way. Timothy has pulled window curtain and shower curtains down, turned over a fish tank, knocked over items on the table, threw items, attempted to hit staff, and signed inappropriate signs." DX-455 at TBID01163-64. A subsequent Individual Support Plan, for the period beginning December 1, 2009, describes that "[b]ehaviors reported per Timothy's staff include pulling window and shower curtains, refusing to get up in the morning to start his day, throwing items, threatening staff via gestures/inappropriate signs, hitting walls/doors, breaking buttons off of his shirt, attempting to break household items, disposing of his equipment and supplies in the commode, packing his shoes and clothing in trash bags, and sometimes spitting at staff. Timothy's provider indicate [sic] that this usually happens when Timothy does not get his way or is mad at staff for some reason." PX-22 at PBH006117. As recounted in a September 10, 2009, Progress Note, Rose "discussed her concerns regarding what she feels are increased behaviors. [She] indicates she is not sure if it is related to Timothy's seizures or what she feels are communication deficits, as Tim signs, but would like to see staff have more communication training." DX-823 at TBID 000201.

The Parties' experts, Dr. Bodfish and Dr. Forrest, again came to opposite conclusions with respect to Timothy's risk of institutionalization. Dr. Forrest concluded, at the time of her initial Report, that Timothy "is not felt to be currently at risk for harm or out-of-home placement," that "[t]here is no evidence of psychiatric decompensation," and that "Timothy's health status and in-home supports have not significantly changed and no facility placement is actively being sought." DX-33 at 54. Likewise, at the time of her

Supplemental Report, Dr. Forrest concluded that "Timothy's situation is about the same as the last time [she] reviewed his case." DX-34 at 13. Dr. Bodfish, however, concluded, at the time of his initial Report, that "Timothy is currently at significant risk of institutionalization," and that "[t]he change in the type of community residence (from own home to group living) and the decrease in supervision and staff support level have produced a clear decompensation in Timothy's status." PX-184 at T6. At the time of his Supplemental Report, Dr. Bodfish concluded that "Timothy's risk of institutionalization is still considered by this examiner to be significant." PX-185 at T2.

The concerns over the depth of Dr. Bodfish's evaluation that plagued his opinions regarding Diane re-emerge with Timothy (and, indeed, the remainder of Plaintiffs in this action). For example, Dr. Bodfish points to the near involuntary commitment of Timothy as evidence of the deficiencies of his care post February 2010 without apparent consideration of the evidence that this event was more directly influenced by Rose's attempts to intervene in Timothy's psychotropic medications. See 9/27/13 Tr. at 124:17-128:15 (Dr. Bodfish). Dr. Bodfish also cited Timothy's staff's use of Valium as amounting to "chemical restraint" (see 9/27/13 Tr. at 16:25-17:8 (Dr. Bodfish), 115:22-25 (Dr. Bodfish)) and in his initial Report stated that "the primary approach for attempting to manage Timothy's increasing behavior problems following [Timothy's] move was through psychiatric medication as opposed to programmatic or staff changes" (PX-184 at T5), but his own detailed review during trial of medication administration records revealed that staff's use of Valium was sparse at best (see 10/2/13 Tr. at 33:18-49:18 (Dr. Bodfish)) and Dr. Bodfish could not support a conclusion that staff attempted to use other

medications to over-medicate Timothy (see id. Tr. at 49:19-54:18 (Dr. Bodfish)).

Moreover, Dr. Bodfish's opinion of Timothy's pre-reimbursement rate reduction circumstances, especially as it is presented in his Reports, seemingly relies heavily on his apparent un-questioning acceptance of Timothy's history as relayed by Rose and reflects a more positive view of that time period than the evidence otherwise suggests. For instance, Dr. Bodfish's initial Report, in describing Timothy's pre-reimbursement rate reduction placement in Raleigh, notes: "Critically, as this home program and these staff persons were set-up specifically for Timothy, all staff in this program during this time were trained in and used ASL and thus could effectively communicate with Timothy." PX-184 at T3. When asked about the source of this information, Dr. Bodfish testified: "Again, this was from Rose." 10/1/13 Tr. at 75:24 (Dr. Bodfish). However, documentary evidence from that time period reflects Rose's concern that Timothy's Raleigh staff in fact were not fully trained to communicate with Timothy (see,e.g., DX-248 at PBH006890; DX-247 at PBH006877). In several other instances on cross-examination, in response to inquiries directed at similar inconsistencies between Dr. Bodfish's understanding of Timothy's past and that presented by Timothy's records, Dr. Bodfish explained that the information he possessed was in large part as Rose relayed it to him. See, e.g., 10/1/13 Tr. at 59:23-61:7 (Dr. Bodfish), 73:14-22 (Dr. Bodfish). Although Dr. Bodfish testified that he found Rose to be credible in this regard (see id. at 59:23-61:7 (Dr. Bodfish)), Rose not only presented during trial as a clear advocate for her son, but also offered testimony that reflected a questionable memory, as demonstrated both by failures to recall events and by statements of the past that conflicted with documentary evidence.

Dr. Forrest's opposite conclusion again presents as more persuasive. Although, as with Diane, Dr. Forrest exhibited some reluctance to attribute negative effects to the reimbursement rate reduction, for example, by seemingly crediting primarily Ms. Yon's report that new interpretations of currently existing regulations forced Timothy from his Raleigh placement despite documentation from Timothy's providers that the rate reduction precipitated this move (see 11/4/13 Tr. at 53:4-54:4 (Dr. Forrest)), her analysis was overall both exhaustive and better supported. Of particular note, Dr. Forrest highlighted the similarity of Timothy's current living situation to his pre-February 2010 Raleigh placement (see 11/4/13 Tr. at 145:4-9 (Dr. Forrest); 167:10-18 (Dr. Forrest)), examined the correlation of Timothy's periods of instability with medication changes prompted by Rose as opposed to a change in his services (11/1/13 Tr. at 202:15-21 (Dr. Forrest); 11/4/13 Tr. at 59:5-14 (Dr. Forrest)), and observed that, even during Timothy's past periods of instability or behavioral outbursts, which resemble Timothy's current behavioral concerns, Timothy's staff has been able to redirect Timothy and maintain him in the community without long-term institutional placement (see 11/4/13 Tr. at 77:15-20 (Dr. Forrest); 114:25-115:19 (Dr. Forrest); 137:8-10 (Dr. Forrest); 177:2-22 (Dr. Forrest)). Moreover, Dr. Forrest's caution regarding the information regarding Timothy as relayed by Rose reflected the impression Rose left during her own testimony. See 11/1/13 Tr. at 185:10-17 (Dr. Forrest) ("I thought she was an incredible advocate for Tim and my sense is from the way she provided things to me that she had been an advocate from the day he hit ground. . . . I questioned when I went back to the record whether it was accurate and so I had some question about her credibility at times or what we say in the clinical terms of whether she was a reliable historian or not.").

The Court again finds Plaintiffs have failed to demonstrate that Timothy is at significant risk of institutionalization or that the February 2010 reimbursement rate reduction affected Timothy's risk. In general, there is insufficient evidence to conclude that Timothy's behaviors present a danger to himself or others, that he is unable to be maintained in the community, or that he is likely on a path to those outcomes. Moreover, there is again a lack of demonstrated causation between the behaviors Timothy has exhibited since the reimbursement rate reduction and any change in his Supervised Living services. The evidence fails to bear out Plaintiffs' primary argument that Timothy's behaviors are connected to Timothy's period of congregate living. In fact, Rose, Timothy's primary advocate, testified that Timothy "and [his housemate] got along fine. They only had one incident in the whole time they lived together . . . ." 9/10/13 Tr. at 90:7-8 (Rose B.).[23] Moreover, Rose was effusive in her praise of Timothy's primary caretakers and has demonstrated little desire to locate an alternate placement. Id. at 82:23-83:13 (Rose B.). And again, there is substantial similarity in the behaviors Timothy exhibited prior to and after the Supervised Living rate reduction.[24]

---

[23] Despite suggestion that Timothy's ability to avoid institutionalization to this point is an effect of the preliminary injunction, Plaintiffs have again failed to present evidence to support that conclusion.

[24] During the course of trial, Plaintiffs, and, to some extent, Dr. Bodfish, focused on a grievance filed by Rose, and later substantiated, against certain of Timothy's staff. In particular, a March 9, 2011 letter summarized an investigation substantiating that: 1) "[s]taff training in [ASL] is not met as evidenced by lack of documentation; 2) "[two] narcotic medications were unaccounted for"; 3) Timothy "was left with a person that was not an employee of Ambleside or [his] guardian"; and 4) "staff is not implementing the behavior support plan." See DX-597 at PBH005979. It is unclear what significance either the inability to account for narcotics or staff's decision to leave Timothy with an unauthorized person has on an analysis of the Supervised Living reimbursement rate reduction central to the instant action as

(continued...)

C.

Plaintiff Clinton L.'s mental health and developmental disability diagnoses include schizoaffective disorder, moderate mental retardation, and intermittent explosive disorder. DX-33 at 32. In addition, Clinton suffers from hypertension, type II diabetes, obesity, sleep apnea, gastroesophageal reflux, and urinary incontinence. Id. Before the February 2010 reimbursement rate reduction, Clinton lived alone in a single-person placement operated by Easter Seals UCP North Carolina ("Easter Seals") which received a reimbursement rate of $161.99 per day from PBH for the provision of Clinton's supervised living services. PX-109 at PBH002806. At the time of the 2010 reimbursement rate reduction, Easter Seals initially informed Clinton that it would not be able to maintain his Supervised Living services; however, Easter Seals subsequently decided to continue Clinton's services, "albeit at a financial loss," contingent on PBH's continued approval of a minimum of 40 hours of a separate, federally-funded service - Home Supports. PX-102 at 2.[25] Accordingly, the February

_____

[24](...continued)
those issues relate not to the service provided, but to individual employees carrying out Timothy's services. To the extent Plaintiffs simply argue the deficiency of Timothy's care, this argument seems more accurately presented as one of negligence, which is not the focus of this action. To the extent Plaintiffs somehow contend that the reduced Supervised Living reimbursement rate resulted in the employment of staff who would conduct the activities complained of in the grievances, the connection is tenuous at best, the discreet acts complained about having no tendency to affect Timothy's risk of institutionalization. Moreover, it is worth noting that it appears staff was terminated for these transgressions. As to staff's implementation of Timothy's behavior plan, the circumstances of Timothy's care, and specifically aspects affecting Timothy's risk of institutionalization, is better addressed by the evidence outline above. Finally, as to staff training in ASL, the evidence regarding such training is addressed briefly in Section IV.

[25] In 2011 or 2012, the Home Supports service became two separate services called In-Home Skill Building and Personal Care. See 10/10/13 Tr. at

(continued...)

2010 reimbursement rate reduction did not cause an immediate change to Clinton's provider or to Clinton's residence.

However, as Plaintiffs point out, Easter Seals did transition Clinton from awake staff to sleep staff at night for budgetary reasons. See PX-115 at PBH003579; PX-116 at PBH003545. Of note, discussions regarding that transition began in June 2009 after what a Progress Note from that time references as "the denial of personal care services through state funded services." See PX-115 at PBH003579. It thus appears that this transition was prompted by a budgetary issue separate from the Supervised Living rate reduction central to this action. See 9/12/13 Tr. at 119:9-18 (Soviero); 200:20-201:11 (Soviero). Regardless, the transition was of concern to Sandy Edmonds, Clinton's sister and guardian, because Clinton had at least some history of being taken advantage of by individuals when without adequate supervision. See 9/12/13 Tr. at 10:8-19 (Edmonds). That is, on one occasion, Clinton allowed a woman into his home early in the morning who stole "[j]ust about everything [Clinton] had." 9/12/13 Tr. at 35:9-10 (Edmonds).

Plaintiffs also contend that staff shortages and increased behavioral issues that followed the reimbursement rate reduction evidence the downgrade of services experienced by Clinton. Indeed, numerous Progress Notes make reference to staff shortages from late 2010 to early 2011. A November 4, 2010, Progress Note, written by Clinton's Care Coordinator, Kristine Best, indicates a "potential concern by Easter Seals [] of not being able to provide the necessary coverage for Clinton with the six staff that Clinton has," but concluded with the statement: "[Margaret Soviero, the Qualified Professional

25(...continued)
89:9-18 (Yon).

with Easter Seals,] informed [Ms. Best] that at this time this in [sic] not a concern about being able to provide services to Clinton but if it becomes a concern then Clinton's services will be reviewed by Easter Seals UCP." DX-200 at PBH03290. A January 6, 2011, Progress Note addresses Clinton "not having support staff" and notes that Easter Seals' failure to provide back up staff "seems to be happening more often." PX-122 at PBH003262. An April 15, 2011, Progress Note recounts Clinton "not having staffing . . . on a Saturday night." PX-133 at PBH003230. Moreover, a March 28, 2012, Progress Note discusses several days in 2010 and 2011 on which Easter Seals did not provide Supervised Living services to Clinton due to a lack of back up staffing. See PX-113 at PBH011405-PBH011406. Although Ms. Soviero testified that, because Clinton's staff included his family members, some staffing issues were the result of family taking time off during a period when Clinton's father was ill and later passed away in 2011, and, while Progress Notes detailing staff shortages do decline after mid-2011, staffing shortages appear to have continued much later. This is evidenced, in part, by an Enhanced Rate Request from May 13, 2013, more than 2 years after Clinton's father's passing, noting that physical aggression by Clinton and serious allegations made by Clinton against staff "have led to severe staffing shortages which puts Clinton at further risk." DX-436 at PBH012246.

The increased behaviors referenced in that Enhanced Rate Request, along with the continued reduced reimbursement rate, prompted Easter Seals to discharge Clinton in 2013. The Enhanced Rate Request itself noted:

> Clinton has had several level III incidents in the past year. Physical aggression has included choking, pushing and brandishing scissors. Clinton has made several unsubstantiated allegations in the past 6 months against staff. Two of these allegations were sexual in nature. Staff have begun reporting feeling increasingly unsafe

working with Clinton due to his size (300 + lbs), intimidating physical behaviors (including cornering staff,) and increasing sexual preoccupation with female staff.

DX-436 at PBH012246. Supporting this statement, a September 2012 Progress Note documents Clinton "hurt[ing] his staff with a pair of scissors" and "chok[ing] his staff." DX-888 at PBH011435. A November 2012 Progress Note describes Clinton hitting his staff and telling staff "that he wanted to hurt himself, to kill himself." Id. at PBH011453. Ms. Soviero similarly testified as to staff's concerns regarding sexual behaviors, false allegations against staff, safety issues around Clinton's attempts to block the path of staff or to intimidate staff (9/12/13 Tr. at 150:14-151:24 (Edmonds)), and noted that similar behavioral issues continued into 2013 (see id. at 201:23-202:17 (Edmonds)).

Through the Enhanced Rate Request, submitted on May 13, 2013, Easter Seals requested an increase to the reimbursement rate for the In-Home Skill Building and Personal Care services that they provided Clinton. See DX-436 at PBH012246. Easter Seals, however, did not seek to increase the rate PBH reimbursed them for provision of Clinton's Supervised Living services. Id. PBH reviewed Clinton's Enhanced Rate Request and, without approving or denying the Request, asked for additional information from Easter Seals to support the need for the enhanced rate. See DX-885 at 2. Easter Seals did not provide the additional information, leaving the Enhanced Rate Request unresolved. See 9/12/13 Tr. at 143:22-144:19 (Soviero), 187:2-10 (Soviero); 10/10/13 Tr. at 150:16-152:20 (Yon). Despite this lack of resolution, by way of letter dated June 12, 2013, Easter Seals cited PBH's "decision . . . that these additional resources are not needed" when informing PBH that it was not able to continue to support Clinton effective August 11, 2013. DX-884. In addition, Easter

Seals noted "the intense nature of Clinton's needs and the complex nature of his natural supports" in concluding that it "can no longer afford to risk the health and safety of [its] staff or Clinton." Id. Easter Seals further provided: "As you are aware, we have operated at a deficit in the past in order to provide needed supports. We can no longer financially afford to provide the needed supports with the Innovations and State Funded Services currently available to Clinton." Id.

On August 11, 2013, Monarch took over Clinton's care without a change in residence and while maintaining Clinton's single-person placement status. With the exception of testimony from Ms. Best that Clinton has not exhibited any "out of the norm" behaviors since that transition (see 9/13/13 Tr. at 115:14-16 (Best)), there is little evidence of Clinton's status under Monarch's care. There is also no evidence regarding whether Monarch operates at a financial deficit to provide Clinton's care.

As with all Plaintiffs, Clinton was not without behavioral issues prior to the reimbursement rate reduction. According to a June 2008 Individual Support Plan, "Clinton has difficulty controlling his temper when he is upset or he does not get his way. He will become verbally aggressive with his workers. He has also in the past thrown things toward his worker, such as a phone. Clinton has also become physically aggressive for example pushing a worker out of the way." DX-185 at PBH002837. Similarly, a Behavioral Support Plan dated August 2009 documents that "Clinton has a history of becoming aggressive towards others when he does not get his way, when he does not understand situations or circumstances that involve him, as well as when he believes he is being treated unfairly." DX-192 at PBH003157. Data sheets used to track Clinton's behavior note incidents from June 2009 to September 2009 of

Clinton threatening staff with physical aggression (see DX-466 at CLES02654, CLES02657, CLES02658) and refusing medications (see id. at CLES02655, CLES02656). Clinton's sister and guardian, Sandy, likewise confirmed Clinton's history of aggressive, and sometimes violent, behaviors:

> Q.   Now I want to touch on some of other testimony from this morning. Now, did you testify that [Clinton] has had violent outbursts throughout his lifetime?
>
> A.   Yes.
>
> Q.   So [Clinton] [has] a long history of that type of aggressive behavior from time to time?
>
> A.   Yes.
>
> Q.   And [Clinton] has a history of becoming so violent at times, that law enforcement might have to be involved?
>
> A.   Yes.

9/12/13 Tr. at 67:20-68:4 (Edmonds).

With respect to the Parties' experts, Dr. Forrest again concluded that Clinton is not at significant risk of institutionalization while Dr. Bodfish again concluded the opposite, at least at the time of his most recent evaluation. Specifically, at the time of her initial Report, Dr. Forrest concluded that "Clinton's hypothesized placement with others will not ultimately cause his placement in an institution," that "Clinton is not felt to be currently at risk for harm or out-of-home placement," and that "[t]here is no evidence of psychiatric decompensation." DX-33 at 34-35. At the time of her Supplemental Report, Dr. Forrest concluded that, "[o]verall, Clinton is doing well in his current placement. He is in the exact same placement as before the rate reductions and he has not experienced any service reductions as a result of the rate reductions." DX-34 at 10. Dr. Bodfish, at the time of his initial Report, concluded that "Clinton is felt to be currently at risk for harm or out-of-home

placement due to the cut back in the number of staff for his program and the lack of an emergency plan for back-up staff" (PX-184 at C4) but clarified during trial that, at the time of his initial Report, he did not feel that Clinton was at "significant" risk of institutionalization (see 9/25/13 Tr. at 158:4-18 (Dr. Bodfish)). However, at the time of his Supplemental Report, Dr. Bodfish concluded that "Clinton's risk of institutionalization has increased relative to the time period of [his] last evaluation of him." PX-185 at C1.

In support of his ultimate conclusion that Clinton was at significant risk of institutionalization, Dr. Bodfish stated in his Supplemental Report that "Clinton exhibited a pattern of persistent behavioral disturbance beginning in January 2012 for approximately 2 months" (PX-185 at C1), but, during trial, Dr. Bodfish struggled to cite behaviors from this period that would support that conclusion (see generally 9/25/13 Tr. at 161:7-219:10 (Dr. Bodfish)). Indeed, one of the incidents that Dr. Bodfish portrayed as an indication of Clinton's increased behaviors during this time was an emergency call, with respect to which he testified: "when I see 911 being called and that wasn't happening previously, that's part of the concern for me" (id. at 167:7-8 (Dr. Bodfish)). However, notes documenting that call provide that it was for severe back pain experienced by Clinton (id. at 166:2-10 (Dr. Bodfish)) and Dr. Bodfish conceded that he has no information indicating that Clinton's staff called 911 for anything other than a physical ailment (id. at 166:12-23 (Dr. Bodfish)).

Dr. Bodfish's Supplemental Report also expressed concern that "[t]wo additional similar but more prolonged patterns of behavioral problems began again in June 2012 (persisting through November 2012) and also January 2013 (persisting through February 2013)" (PX-185 at C1) and noted that "[a]s a result of these recurrent behavioral decompensations, Clinton's PBH Care

Coordination team decided that Clinton required a change in his psychiatric medication in November 2012, suggesting a recognition that Clinton's condition has worsened" (id.). In writing that statement, however, Dr. Bodfish, did not appear to consider the inverse possibility that medication changes for reasons unrelated to Clinton's behaviors precipitated those behavioral events. See 9/26/13 Tr. at 14:6-17:9 (Dr. Bodfish). In fact, despite explicitly describing Clinton's change in medication as driven by increased behaviors in his Supplemental Report, and even inferring that this sequence of events signified a "recognition that Clinton's condition has worsened" (PX-185 at C1), when asked whether he had an understanding "of whether behaviors are following changes in medication or whether changes in medication are following behaviors" (9/26/13 Tr. at 23:4-6 (Dr. Bodfish)), Dr. Bodfish responded: "That's the speculative part. It is always hard to sort that out." (id. at 23:7-8 (Dr. Bodfish)). When subsequently asked whether he made an attempt to sort that out, Dr. Bodfish testified that "he wasn't able to make a definitive conclusion on that." Id. at 24:4-5 (Dr. Bodfish).

As noted, Dr. Forrest reached the opposite conclusion. As with Timothy, Dr. Forrest described the similarity of Clinton's current living situation and services to those he experienced prior to the February 2010 rate reduction. See 10/29/13 Tr. at 15:2-23 (Dr. Forrest). And Dr. Forrest's analysis of the effects of medication changes on Clinton's behaviors (see id. at 15:24-19:17 (Dr. Forrest)) was both more comprehensive and better aligned with the documentary evidence than the position offered by Dr. Bodfish. Plaintiffs criticized Dr. Forrest for downplaying one of her objective measures, the Aberrant Behavior Checklist, which ranked Clinton's irritability as high, in favor of her own clinical judgement after, as she testified, subsequent conversations

with the survey taker and Clinton's direct care staff led her to believe that the results of the Aberrant Behavior Checklist did not accurately reflect Clinton's situation. Dr. Forrest, however, adequately and persuasively described her reasons for doing so. See 10/29/13 Tr. at 8:1-9:9 (Dr. Forrest).

Although the evidence in Clinton's case arguably supports a finding that Clinton's behaviors have increased since February 2010, it is found that the evidence is insufficient to conclude either that Clinton is at significant risk of institutionalization or that the Supervised Living reimbursement rate reduction "will likely cause a decline in health, safety, or welfare that would lead to [Clinton's] eventual placement in an institution," U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*, http://www.ada.gov./olmstead/q&a_olmstead.htm#ftnref14 (last updated June 22, 2011). In fact, of Plaintiffs, Clinton's circumstances are among the least affected by the Supervised Living reimbursement rate reduction. Clinton continues to live in the same physical location, without housemates, and enjoys a similar level of services. Compare PX-108 at PBH002817 and PX-125 at PBH003148, with DX-886 at 9.[26] Moreover, even if Clinton's transition from awake staff to sleep staff at night can be attributed to the Supervised Living reimbursement rate reduction as opposed to an earlier denial of personal care services, there is no evidence that Clinton has suffered adverse affects since that change, and Plaintiffs point primarily to a single event - when a woman allowed into his residence one night took advantage of Clinton - as evidence that awake staff is necessary, giving little indication that a future incident is a

---

[26] Per Ms. Soviero, state funded personal assistance is the same as personal care. See 9/12/13 Tr. at 114:6-18.

viable concern. In sum, on the evidence presented, there is no basis to conclude that Clinton is any more imminent danger to himself or others than prior to the rate reduction, that he has decompensated to a point that he can no longer be maintained in the community, or that such is likely. Accordingly, Plaintiffs have failed to carry their burden.

D.

Plaintiff Jason A.'s mental health and developmental disability diagnoses include mood disorder with aggression, obsessive compulsive disorder, attention deficit/hyperactivity disorder, moderate mental retardation, and autism. DX-35 at 41-42; 9/18/13 Tr. at 33:12-15 (Benton). Prior to the February 2010 reimbursement rate reduction, Jason lived with one housemate, Anderson, in a three-person home operated by RHA Health Services, Inc. ("RHA"). PX-172 at JAID 000361. At that time, RHA received a reimbursement rate of $161.91 per day from PBH for the provision of Jason's Supervised Living services. Id.; 9/18/13 Tr. at 64:13-18 (Benton). As a result of the reimbursement rate reduction, on March 5, 2010, a third housemate joined Jason's home. DX-539 at JAID 000207.

Jason's behaviors post-rate reduction include numerous incidents of verbal and physical aggression, especially during a period in spring 2010. That is, in April 2010, Jason visited crisis respite after several days of increased agitation and aggression. Many of Jason's behavioral incidents during this time involved conflicts between Jason and his housemates over use of the washing machine, a frequent trigger for Jason's behaviors (see, e.g., DX-590 at PBH004549; DX-583 at PBH004533; DX-585 at PBH004537), but also included other acts of physical aggression unrelated to that trigger (see, e.g.,

DX-584 at PBH004535-36; DX-589 at PBH004547-48; DX-586 at PBH004541-42; DX-588 at PBH004545-46).

Of note, however, Jason exhibited perhaps more severe behaviors in 2009 - prior to the reimbursement rate reduction and when Anderson was his only housemate. An update to Jason's Individual Support Plan from a meeting in June 2009 notes that "Jason is easily agitated and has severe physical aggression and property damage when upset. He recently broke his mother's finger during a time that she was visiting with him at his home, due to being upset with his housemate. Jason also recently required stitches due to cutting himself on the dinning [sic] room light fixture when arguing with his housemate." DX-202 at PBH003740. A subsequent Individual Support Plan for Jason from August 2009 notes that "Jason's behaviors have increased since 1/09" and that "Jason was seen at Rowan Regional Medical Center on 7/9/09 for displaying out of control behaviors. He was assessed by NC Start program and admitted to RHA Respite Home in Statesville from 7/10/09-7/15/09 and again from 8/27/09-8/30/09 due to displaying out of control behaviors. RHA Respite Program has prevented Jason from being hospitalized in a psychiatric hospital." DX-204 at PBH004048.

With respect to Jason, Defendants' expert, Dr. Forrest, concluded, at the time of her initial Report, that "Jason is not felt to be currently at risk for harm of out-of-home placement," that "Jason does not pose an imminent danger to self or others," and that "[t]here is no evidence of psychiatric decompensation." DX-33 at 43. At the time of her Supplemental Report, Dr. Forrest concluded that "Jason is doing well in his placement" and that "[t]he February 2010 rate reduction has not caused a reduction in services that places Jason at greater risk of institutionalization than he was prior to the rate reduction." DX-34 at

12.  Plaintiffs' expert, Dr. Bodfish, concluded at the time of his initial Report that "Jason is currently at significant risk of institutionalization" and that "[t]he change in type of community residence (from 2 to 3 person group home) and the decrease in supervision and staff support level have produced a clear decompensation in Jason's status."  PX-184 at J5.  At the time of his Supplemental Report, Dr. Bodfish concluded that "Jason's risk of institutionalization has not changed since [his] last evaluation of him."  PX-185 at D2 J1 V1.  However, despite that language, as well as testimony consistent with an opinion that Jason is at significant risk of institutionalization, Dr. Bodfish's entire "Conclusion" in his Supplemental Report reads much differently.  In full, it states:

> Jason's risk for institutionalization has not changed since my last evaluation of him.  He has continued to progress and have his habilitation and personal needs met in his home community.  He continues to manifest the kinds of psychiatric symptoms (autism) and occasional challenging behaviors (episodic agitation and aggression) that he has throughout much of his history, and he continues to require intense staffing (1:1 during waking hours and occasionally 1:1 for 24 hrs.) and individualized behavior programming and a low density, consistent and predictable living arrangement.  These features have been able to remain part of his plan of care under his current funding arrangement and thus significantly diminish the likelihood that he will be institutionalized in the future as long as this plan of care and intensity of services remains in place in the community.

Id. (emphasis added).

Other inconsistencies appear in Dr. Bodfish's opinion as well.  In describing Jason's pre-rate reduction placement in his initial Report, Dr. Bodfish stated: "Critically, as this home and these staff persons were set-up specifically for Jason, all staff in this program during this time were trained in autism and in Jason's unique needs and rituals and thus could effectively communicate with Jason, accommodate his idiosyncratic needs, and effectively prevent his

behavior problems from occurring." PX-184 at J3. Similarly, Dr. Bodfish's initial Report noted that Jason "lived successfully in his community" during the period prior to the rate reduction. PX-184 at J5. However, during trial, Dr. Bodfish agreed that 2009 was a particularly difficult year for Jason (see 10/4/13 Tr. at 69:12-14 (Dr. Bodfish)) and, in fact, opined that Jason was at significant risk of institutionalization during that period as well (see id. at 96:18-24 (Dr. Bodfish)). In attempting to explain how this position conformed with his overall positive view of Jason's pre-rate reduction period as expressed in his Reports, Dr. Bodfish elaborated that, in his Reports, he was providing an overall picture of Jason's circumstances prior to the reimbursement rate reduction and was not focused on any single year in particular (see id. at 71:14-22 (Dr. Bodfish)). However, the evidence reflects scarce detailed documentary records of Jason's behavior prior to 2008 on which to base such a conclusion. See PX-198; 10/4/13 Tr. at 3:23-4:15 (Dr. Bodfish), 69:3-11 (Dr. Bodfish).

Moreover, there was little demonstrated other evidence on which Dr. Bodfish could rely to inform his opinion of Jason's pre-rate reduction period. Dr. Bodfish testified that he did not speak to Jason's mother and guardian, Brenda, but merely read an affidavit she provided. (See 10/4/13 Tr. at 48:12-21 (Dr. Bodfish)). Instead, Dr. Bodfish expressed a heavy reliance on reports from Jason's long-time caregiver, Mary. See id. at 115:4-19 (Dr. Bodfish). However, during her own testimony, Mary reflected difficulty recalling details of events that occurred at any significant time in the past. See, e.g., 9/23/13 Tr. at 28:15-29:7, 30:6-20, 30:24-31:14 (Rothwell). In addition, Dr. Forrest reported receiving information from Mary somewhat in tension with the information Dr. Bodfish relayed (compare 10/30/13 Tr. at 101:7-20 (Dr.

Forrest), with 10/4/13 Tr. at 115:4-19 (Dr. Bodfish)), which further calls into question the accuracy of Mary's information.[27]

In addition, Dr. Bodfish testified that he felt the primary trigger after the rate reduction was the addition of a third housemate and the resulting changes in Jason's staffing pattern (see 10/4/13 Tr. at 98:12-17 (Dr. Bodfish)); however, evidence of direct conflict between Jason and his newer housemates was limited, especially in comparison to multiple documented incidents between Jason and his long-time housemate Anderson (see, e.g., id. at 103:16-104:15, 105:16-106:3, 123:15-23, 137:9-25 (Dr. Bodfish)), who Dr. Bodfish felt was an appropriate living housemate (see id. at 62:12-19 (Dr. Bodfish)). As to the source of his information regarding the issues between Jason and his newer housemates, Dr. Bodfish here, again, expressed a reliance on Mary's reports, but also as to his own impression, drawn from a single meeting, that Jason's level of agitation noticeably increased when his third housemate was present. See id. at 99:2-20 (Dr. Bodfish).

Dr. Forrest's opinion again presented as more thorough and based on a more comprehensive view of the Plaintiff. Dr. Forrest highlighted that Jason's direct conflicts with a housemate more likely involved his long time housemate Anderson (see 10/30/13 Tr. at 102:16-22 (Dr. Forrest)), noted Jason's recent lack of physically aggressive behaviors and, indeed, the removal of physical aggression as a problem behavior needing to be addressed in Jason's annual plan (see id. at 101:25-102:9 (Dr. Forrest)). She also pointed to Jason's relative stability in that Jason remains in the same home, has retained at least one long time staff member and, despite some staffing changes, as of the most

_____

[27] Mary's testimony was insufficiently detailed to determine which, if either, expert more accurately reflects her view.

recent information she reviewed, continues to receive 1:1 staffing during the day (see id. at 110:6-111:15 (Dr. Bodfish)).  In addition, Dr. Forrest noted staff's ability to maintain Jason in the community even during previous periods of behavioral outbursts.  See id. at 123:22-124:4 (Dr. Forrest).  Concerns raised by Dr. Forrest's testimony were again minor in comparison to those presented by Dr. Bodfish.  For example, Dr. Forrest again displayed some hesitancy to attribute negative events to the Supervised Living reimbursement rate reduction.  When presented a document stating, somewhat explicitly, that "[o]n 3/5/10 Jason got a new housemate (due to a cut in his Supervised Living funding) and has had difficulty with the change and additional person in the home" (PX-166 at JAID 000209), Dr. Forrest refused to conclude that the author drew any connection between the addition of a housemate and Jason's difficulties at the time, stating instead: "I don't know.  She's got a lot of and's in there.  She said he got a new housemate due to a cut in supervised living and has difficulty with change and additional person in the home" (10/30/13 Tr. at 126:2-5 (Dr. Forrest)).

On this showing, Plaintiffs have failed to demonstrate that Jason is at significant risk of institutionalization or that the February 2010 rate reduction has resulted in events affecting that risk.  Jason's post-February 2010 behaviors are equally, if not less, severe than his immediately pre-February 2010 behaviors.  In fact, both experts agreed that 2009 was a particularly bad year for Jason.  See 10/4/13 Tr. at 69:12-14 (Dr. Bodfish); 10/30/13 Tr. at 99:23-100:2 (Dr. Forrest). Moreover, per the testimony of Jason's mother and guardian, Brenda A., Jason's violent behaviors have decreased in the post rate-reduction period (see 9/19/13 Tr. at 60:8-14 (Brenda A.)), and, furthermore, during the post-rate reduction period, Jason's staff has removed "physical

aggression" as one of the top two behaviors that need to be addressed through Jason's behavioral plans.  See DX-294 at PBH010853.  The evidence that Dr. Bodfish cites as exhibiting a mismatch in Jason's plan of care fails to demonstrate that Jason is, or is on a path to be, an imminent danger to himself or others or that his providers will no longer be able to maintain him in the community.  There is an insufficient basis to conclude that Jason is at significant risk of institutionalization or that the Supervised Living rate reduction will likely lead to his eventual placement in an institution.

E.

Plaintiff Steven C.'s diagnoses include depressive disorder, intermittent explosive disorder, oppositional defiant disorder, mild mental retardation with intermittent antisocial behavior, and pedophilia.  DX-439 at SCID 000052; DX-122 at PBH000201.  Steven is unique among Plaintiffs in that he is his own guardian.  PX-83 at PBH000675; DX-770 at SCOT00033.  Prior to the February 2010 reimbursement rate reduction, Steven resided alone with Supervised Living services provided by Monarch who received a reimbursement rate of $161.99 from PBH for providing those services.  PX-83 at PBH000675; DX-122 at PBH000197.

In January 2010, Monarch informed Steven that it would no longer be able to provide his Supervised Living services in his single-person home under the reduced rate and that "they could only continue to support Steven in a group home setting or in an [Alternative Family Living ("AFL")] setting."  PX-83 at PBH000675.[28]  As a result, in April 2010, Steven moved into a group home operated by Youth Adult Care Management ("YACM") which, although licensed

---

[28] An AFL "is like [a] foster care family."  10/31/13 Tr. at 144:4-5 (Dr. Forrest).

as a three-person home, he shared with only one additional housemate.  See 10/10/13 Tr. at 185:5-13 (Yon).  Steven's time in the YACM group home was unsuccessful and short-lived.  An Incident Report from July 19, 2010, reflects that Steven refused to come out of his room during first shift, attempted to provoke his housemate, and had made three-months of long distance phone calls to a "sex chat line."  PX-72 at SC000014-15.  Steven did not hide his dissatisfaction with this placement and, in fact, "stated [that] if he got [YACM] shut down, then he wouldn't have to live in a group home."  Id. at SC000015.

Steven left the YACM home in December 2010 after YACM decided to close that home due to an inability to fill its open vacancy for a third resident (see 10/10/13 Tr. at 188:15-25 (Yon)), and Steven moved into an AFL placement in Cabarrus County supervised by Mr. Clark with RHA as his provider (see id. at 189:9-18 (Yon)).  Steven's AFL placement in Cabarrus County, which also had an additional housemate (see id.), was, in contrast to Steven's previous placement, successful (see id. at 191:13-15 (Yon)).  Regardless, Steven desired to be closer to his family and, in August or September of 2011, moved into a new AFL placement supervised by an individual named Josh with Building Bridges as his provider.  See id. at 192:2-9 (Yon).  In September 2011, several failures in Josh's supervision of Steven including, on one occasion, leaving Steven unattended, resulted in a young woman named Jamie taking over Steven's AFL placement.  See PX-70 at PBH010975; 10/10/13 Tr. at 192:12-25 (Yon).  Shortly thereafter, Steven and Jamie moved residences and switched providers to Alberta Professional Services, Inc. ("Alberta").  See 10/10/13 Tr. at 198:9-200:7 (Yon).  Steven's placement with Jamie ended in August 2012 after their relationship deteriorated and after Steven's long-time staff, Gena, filed a grievance against Jamie on August 24, 2012.  See PX-74;

10/11/13 Tr. at 9:12-10:17 (Yon). That grievance complained that Jamie was "verbally abusive towards [Steven]," that Jamie "was making suicidal statements while [Steven] was in the house," and that Jamie "attempted to give away [Steven's] dog by putting a listing on Craigslist." PX-74 at SCAL00012. An investigation conducted by Alberta's Quality Management department as a result of this grievance concluded that "the original reported concerns were not substantiated; however, Quality Management determined that health and safety issues exist at the AFL house which jeopardizes the therapeutic relationship." Id. at SCAL00012.

With this, "[a]s of August 27, 2012, neither natural supports nor Alberta were able to continue to care for [Steven] 24 hours a day, and Steven had no place to go." DX-770 at SCOT00033. As a result, Monarch provided respite services to Steven in a hotel setting. Id. Of note, "Steven[, as his own guardian,] had been presented with four options for temporary placement . . .[, but] Steven felt that these were not feasible for him as they were too far away from Lexington." Id. Without a placement, on August 31, 2012, Steven moved in with his father (DX-443 at SCOT00025), where, as of the most recent information provided during trial, Steven currently resides. Steven is ineligible to receive Supervised Living services while residing with his father (id.), and there is little evidence of Steven's status during the time he has resided with his father.

Steven's requirements for his placement have made finding a suitable location difficult. As noted in a May 23, 2013 Progress Note, those requirements are somewhat specific: Steven wants to live in Lexington, to be able to see his family, to have cable and internet and for his AFL worker to be white, to be a non-smoker, to be active, to be responsible, and not to talk about

-61-

politics. PX-96 at PBH012041. Moreover, according to Ms. Yon, Steven has rejected multiple placements for personal reasons unrelated to the placement's ability to adequately meet Steven's needs. See 10/10/13 Tr. at 183:11-20 (Yon). Those reasons have included the clothes of the AFL worker and a placement displaying a picture of the President. See id.

With respect to Steven, the Parties' experts not only reached opposite conclusions regarding risk of institutionalization, but also came to opposite conclusions as to Steven's direction between the time of their initial and supplemental Reports. Defendants' expert, Dr. Forrest, concluded at the time of her initial Report that Steven "is not felt to be currently at risk for harm or out-of-home placement," that "Steven does not pose an imminent danger to self or others," and that "[t]here is no evidence of psychiatric decompensation." DX-33 at 48. At the time of her Supplemental Report, Dr. Forrest concluded that "Steven appears to be more stabilized and integrated into the community than he was at the time of [her] initial Report." DX-34 at 12. On the other hand, Dr. Bodfish, Plaintiffs' expert, concluded at the time of his initial Report that "Steven is currently at significant risk of institutionalization" and that "[t]he change in the type of community residence (from a home alone to a 2 person group home), the decrease in supervision and staff support level, and the need for multiple placements have produced a decompensation in Steven's status." PX-184 at S-5. At the time of his Supplemental Report, Dr. Bodfish concluded that "Steven's risk for institutionalization has significantly increased since [his] last evaluation of him." PX-185 at S2 TB1.

Steven, by way of deposition taken November 21, 2011, offered his own opinion of his risk of institutionalization:

Q. Do you think there's any reason that you would have to go to an institution instead of staying at your own house?

A. Huh-uh, there ain't no reason.

. . . .

Q. Do you think there is any time in the past couple of years where you have been at risk for being going to an institution?

A. No.

. . . .

Q. If someone had told you that you were at risk of going into an institution, would you think they were wrong, Steven?

A. Yeah, because, because they would be wrong.

10/22/13 Tr. at 147:13-149:22; Dep. of Steven C., Nov. 21, 2011 at 58:24 - 61:7. Steven's belief that he is not in danger of suffering the injury alleged in the Complaint undermines his claims.

Regardless, there is no reason to disagree with Steven's own assessment. That the focus during trial was on Steven's frequent residency changes and his current lack of placement (as described above), as opposed to difficult behaviors or any decompensation in Steven's status, is a reflection of the lack of circumstances that would suggest Steven is at risk of institutionalization. Perhaps realizing this deficiency, Plaintiffs argued during closing arguments not that Steven may require placement in a facility for the treatment of his mental health or developmental disability diagnoses, but that Steven's lack of an adequate supervisory environment will result in Steven's incarceration - an outcome Plaintiffs equated with institutionalization for purposes of their claim. See 11/13/13 Tr. at 104:14-22. During their closing arguments, Plaintiffs stressed that "one impulsive act" by Steven could make that outcome a reality. See id. at 128:7-21. However, as an initial matter, a jail or prison environment is not the type of institution which is properly the focus of Plaintiffs' instant

ADA and Rehabilitation Act claims. Regardless, Plaintiffs' "impulsive act" argument cannot carry their claims in the face of multiple years of evidence demonstrating Steven's ability to function without indulging such hypothetical impulses. To hold otherwise would disregard the evidence in favor of an entirely unpredictable future event that the evidence does not support. In sum, there is no basis to conclude that Steven is at significant risk of institutionalization or that the February 2010 reimbursement rate reduction "will likely cause a decline in health, safety, or welfare that would lead to [Steven's] eventual placement in an institution," U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*, http://www.ada.gov./olmstead/ q&a_olmstead.htm (last updated June 22, 2011).

F.

Finally, Plaintiff Vernon W.'s diagnoses include severe mental retardation (DX-136 at PBH000952), as well as depressive disorder and seizure disorder (DX-142 at PBH001327). Prior to the February 2010 reimbursement rate reduction, Vernon lived alone in a mobile home purchased by his father where YACM provided Vernon's Supervised Living services at a rate of $161.99 per day. DX-144 at PBH001340. In a letter addressed to Vernon's father and guardian, Vernon Sr.,[29] dated January 21, 2010, YACM informed Vernon Sr. of the following:

> We have received notification from People Driven Supports that Vernon will continue to receive his Supervise [sic] Living, but will

---

[29] Vernon Sr. serves as Vernon W.'s co-guardian along with Vernon W.'s mother, Angeline Martin. <u>See</u> PX-145 at PBH010950. Ms. Martin did not testify during trial.

have a rate reduction effective April 15, 2010. [YACM] will continue to provide current service (Home Supports, Specialized Consultative Services and Supervise [sic] Living) until April 15, 2010. Due to these unfortunate changes, [YACM] will no longer provide 24hr. supervision to Vernon. [YACM] will continue to provide Home Support and Specialized Consultative Services for the allotted hours in his Plan/Authorization.

We have presented the option of [Vernon] receiving services in a group home setting, which would allow him to receive Residential Support Service and would guarantee 24 hour supervision daily from our staff.

PX-140 at PBH001716.

PBH subsequently granted an extension for YACM to continue Vernon's services at a pre-rate reduction rate until April 29, 2010 (see PX-138 at PBH001832), and, although guardian Vernon Sr. faced difficulty finding a replacement provider due to the rate reduction (see 09/16/13 Tr. at 48:16-50:19 (Vernon W., Sr.)), on April 30, 2010, Omni Visions, Inc. ("Omni Visions") took over the responsibility of providing supervision for Vernon in Vernon's home at the reduced reimbursement rate (PX-155 at VWDV00096).

Under Omni Vision's care, Vernon experienced two primary negative effects: (1) staff shortages; and (2) a transition from awake staff at night to sleep staff at night (see 09/16/13 Tr. at 62:8-12). With respect to the transition from awake staff to sleep staff, Vernon Sr. cited concerns over Vernon's behavior at night, including possible elopement, as necessitating awake staff. Id. at 74:21-75:9 (Vernon W., Sr.), 41:22-42:4 (Vernon W., Sr.). Vernon Sr. was provided with alarms intended to alert staff if Vernon awoke and attempted to leave his room or the home. Vernon Sr., however, has elected not to install those alarms, citing concerns over their quality. See id. at 75:12-18 (Vernon W., Sr.).

With respect to staff shortages, an August 24, 2011 Progress Note indicates that only two staff members served Vernon at that time. See PX-145 at PBH010941. An August 29, 2011 Progress Note indicates that only Jeff, one of Vernon's long-time staffers, was working along with "fill in" staff as Vernon's other regular staff member was out on medical leave. Id. at PBH010942. An October 6, 2011 Progress Note indicates that if Omni Visions is unable to find additional staff relatively soon, they would have to serve Vernon a discharge notice. Id. at PBH010950. Shortly thereafter, Omni Visions did in fact provide Vernon W., Sr. a discharge notice indicating that it would cease providing services to Vernon on December 31, 2011, "[d]ue to the limitations of funding and staffing." PX-136 at 1; PX-145 at PBH010959. In light of Omni Visions' upcoming discharge, PBH began attempting to locate alternate providers for Vernon. See, e.g., PX-145 at PBH010959. Omni Visions extended their discharge date to January 31, 2012, and Monarch took over Vernon's services as of February 1, 2012. There is no evidence that Vernon's staff shortages continued after Monarch became Vernon's provider.

Both Dr. Forrest and Dr. Bodfish ultimately came to the same conclusion with respect to Vernon's risk of institutionalization. At the time of their initial Reports, Dr. Forrest concluded that "Vernon is not felt to be currently at risk for harm or out-of-home placement" (DX-33 at 58) and Dr. Bodfish concluded that "Vernon would likely be at increased risk for institutionalization if his current independent living program were discontinued or if his level of staffing were decreased" (PX-184 at V4). At the time of their Supplemental Reports, Dr. Forrest concluded that "[t]he February 2010 rate reduction has not caused a reduction in services that places Vernon at a greater risk of institutionalization than he was prior to the rate reduction" (DX-34 at 13) and Dr. Bodfish

concluded that "Vernon's risk of institutionalization has decreased since [his] last evaluation of him" (PX-185 at V2 S1) and, at trial, testified that "at this point with the plan of care the way it was and the way it was being operationalized that he    that I did not see [Vernon] at a significant risk" (10/3/13 Tr. at 131:4-6 (Dr. Bodfish)).

There is no reason to reject the opinions of both experts with respect to Vernon's risk of institutionalization.  Vernon currently lives in the same home he occupied prior to the reimbursement rate reduction, has retained Jeff, a long-time staff member, and enjoys similar services.  There is a lack of evidence of increased behavioral incidents, and staff shortages that existed at one point, to the extent they can be attributed to the Supervised Living rate reduction, appear to be resolved.  Despite hypothesized concerns regarding Vernon's eloping or engaging in unsafe activity in his home at night absent awake staff, those concerns have not come to fruition since the February 2010 reimbursement rate reduction became effective, and there is no plausible indication that such activity is likely in the future or would be sufficiently pervasive or severe so as to create a significant risk of institutionalization.  See 9/16/13 Tr. at 105:24-106:9 (Vernon W., Sr.), 121:8-19 (Vernon W., Sr.). There is, in general, a lack of evidence of a mismatch in Vernon's plan of care or of any inability on the part of Vernon's providers to continue to maintain him in the community.  Accordingly, an insufficient basis exists to conclude that Vernon is at significant risk of institutionalization due to the Supervised Living reimbursement rate reduction or that the Supervised Living reimbursement rate reduction "will likely cause a decline in health, safety, or welfare that would lead to [Vernon's] eventual placement in an institution," U.S. Dep't of Justice, *Statement of the Department of Justice on Enforcement of the Integration*

*Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C.*,
http://www.ada.gov./olmstead/q&a_olmstead.htm#ftnref14 (last updated June
22, 2011).

IV.

Timothy B. separately claims that Defendants have violated Regulations
implementing Title II of the ADA by failing to provide effective, accessible
communication and appropriate auxiliary aids in the delivery of services to
accommodate his deafness. See Doc. #139, ¶¶ 134-143. Generally, as it is
relevant here, Regulations implementing Title II provide that "[a] public entity,
in providing any aid, benefit, or service, may not, directly or through contractual
licensing, or other arrangements, on the basis of disability. . . [p]rovide a
qualified individual with a disability with an aid, benefit, or service that is not
as effective in affording equal opportunity to obtain the same result, to gain the
same benefit, or to reach to same level of achievement as that provided to
others[.]"    28 C.F.R. § 35.130(b)(1)(iii).    Specifically as it relates to
communications, the Regulations go on to provide that "[a] public entity shall
take appropriate steps to ensure that communications with applicants,
participants, members of the public, and companions with disabilities are as
effective as communications with others," 28 C.F.R. § 35.160(a)(1), and,
similarly, that "[a] public entity shall furnish appropriate auxiliary aids and
services where necessary to afford individuals with disabilities . . . an equal
opportunity to participate in, and enjoy the benefits of, a service, program, or
activity of a public entity," 28 C.F.R. § 35.160(b)(1).

In this regard,

[t]he type of auxiliary aid or service necessary to ensure effective
communication will vary in accordance with the method of
communication used by the individual; the nature, length, and

> complexity of the communication involved; and the context in which the communication is taking place. . . . In order to be effective, auxiliary aids must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability.

28 C.F.R. § 35.160(b)(2). "In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities." Id. Specifically, "[t]he public entity shall honor the [disabled individual's] choice [of auxiliary aid] unless it can demonstrate another effective means of communication exists or that use of the means chosen would not be required under § 35.164." 28 C.F.R. pt. 35, app. A.[30]

As an initial matter, with respect to Timothy's accommodation claim, Plaintiffs' argument focuses almost entirely on the discrepancy in the ASL abilities of Timothy and his staff as opposed to other deaf-oriented accommodations such as fire alarms, doorbells, and telephone systems.[31] Accordingly, the success of Plaintiffs' accommodation claim turns on whether any communication deficit, based on ASL proficiency, between Timothy and his

---

[30] In interpreting the Rehabilitation Act, the Supreme Court has held that qualified persons with disabilities must receive "meaningful access" to a public entity's services. See Alexander v. Choate, 469 U.S. 287, 301 (1985) ("[A]n otherwise qualified handicapped individual must be provided with meaningful access to the benefit that the grantee offers. . . . [T]o assure meaningful access, reasonable accommodations in the grantee's program or benefit may have to be made."). Other courts have extended this to Title II as well. See Bahl v. County of Ramsey, 695 F.3d 778, 784 (8th Cir. 2012) ("We have construed Title II of the ADA and its implementing regulations as requiring that qualified persons with disabilities receive effective communication that results in 'meaningful access' to a public entity's services.").

[31] Neither ASL expert discussed other deaf-oriented accommodations and, although Dr. Bodfish testified in some degree as to the existence of those items (see 10/3/13 Tr. at 28:22-31:9 (Dr. Bodfish)), more specific questioning on cross examination revealed the cursory nature of his investigation (see, e.g., 10/3/13 Tr. at 31:15-33:2 (Dr. Bodfish)).

staff denies Timothy the necessary participation in the state's mental health and developmental disability services.[32]

Such an analysis is not straightforward, however, because "the method of communication used by [Timothy]," 28 C.F.R. § 35.160(b)(2), is affected by his severe cognitive deficits. While both Parties' experts acknowledged that Timothy's cognitive impairments impact his ability to communicate, their conclusions differed regarding what level of ASL Timothy is able to employ and what skill, in turn, would be required of a caregiver in order to allow Timothy to enjoy services in his home and community. Defendants' expert, Ms. Mariann Carter,[33] found that "Timothy has very limited language vocabulary and ability, and overall he uses language for function and to attempt topical relationships with those around him" (DX-870 at 6) and concluded that, "[b]ased on his current language level and abilities, and given his current age, Timothy's results demonstrate that he needs caregivers who are able to sign <u>basic</u> information," (<u>id.</u> (emphasis added)). She further concluded that "ensuring that a person has <u>minimally adequate</u> conversational sign language skill would be sufficient in addressing Timothy's language needs as well as stimulating his ideas and topics of conversation, albeit repetitive in nature." <u>Id.</u> at 7 (emphasis added).

---

[32] Plaintiffs do not point to any discrete instance, or even particular service, for which they contend that communication is lacking. Instead, they broadly focus on Timothy's general living and supervisory environment. Thus, consideration of the "the nature, length, and complexity of the communication involved[] and the context in which the communication is taking place," 28 C.F.R. § 35.160(b)(2), requires evaluating Timothy's supervisory and rehabilitative needs on a daily basis.

[33] Defendants tendered, and the Court qualified, Ms. Carter as an expert in sign language communication, education for the deaf and hard-of-hearing, including in education for deaf and hard-of-hearing who also have learning or developmental disabilities, and in the assessment of communication and language development in individuals who are deaf and hard-of-hearing. <u>See</u> 10/24/13 Tr. at 20:3-16 (Ms. Carter).

Plaintiffs' expert, Dr. Barrie Morganstein,[34] found that Timothy had "more than basic knowledge of ASL vocabulary" and that "almost 100% of the signs used by [Timothy] during the four-hour evaluation with [her] were 'traditional' ASL and were not signs of his own creation." PX-186 at 10. She concluded that, "given his level of ASL and communication ability, [Timothy] should be provided with direct-care staff members who are sign fluent and are able to easily carry on conversations in ASL." Id.

The evidence presented during trial better supports Ms. Carter's assessment of Timothy's abilities and needs. Indeed, Ms. Carter's findings corroborate a January 2010 assessment conducted by Dr. Juliann Brunson, a Ph.D. level psychiatrist who is deaf and communicates using ASL, which concluded that Timothy's "signs and stories were frequently unclear, lacked fluency, and demonstrated a limited vocabulary or knowledge of sign language." PX-24 at PBH006045.[35] Specifically, Ms. Carter observed that Timothy "is able to stay on topic most of the time for maybe two signs, sometimes not even two signs," 10/24/13 Tr. at 99:14-15 (Carter), and lacked the ability to engage in any in-depth conversation. Even Dr. Morganstein, in reviewing her conversations with Timothy, acknowledged that Timothy's signing lacked fluency (see 11/7/13 Tr. at 44:1-9 (Dr. Morganstein)), and expressed difficulty following Timothy's thoughts (see, e.g., id. at 33:25-34:14 (Dr. Morganstein)). In fact, in both experts' attempts to interpret Timothy's ASL during trial (as it

[34] Plaintiffs tendered, and the Court qualified, Dr. Morganstein as an expert in sign language communication with deaf clients, particularly those who also have other disabilities such as mental illness or a developmental disability. See 9/11/13 Tr. at 24:9-25:7 (Dr. Morganstein).

[35] Ms. Carter testified that she had not seen the January 2010 assessment before completing her report. 10/24/13 Tr. at 105:24-106:1 (Carter).

was displayed from videos created during Ms. Carter's in-person evaluation of Timothy), it was apparent that, as Ms. Carter noted, Timothy "hops with no reason to go from one topic to another, and [that] he is unable, most of the time, to answer any questions and respond back in an appropriate way." 10/24/13 Tr. at 99:22-23 (Carter). Even in response to questions from Ms. Carter, who it was clear that Timothy was fond of and wished to engage with, Ms. Carter noted that Timothy "a few times [] answer[ed] [her] and says, yes, or something like that, but most of the time there [was] no more information than that." Id. at 100:7-9 (Carter). Ms. Carter further observed: "I don't think he ever said no to anything I said. He's able to do that, but he's not able to give me more information." Id. at 100:9-10 (Carter).

Rather, as is referenced in nearly every discussion of Timothy's communication, it appears Timothy is more intent in repeating stories from his past than engaging in two-way conversation. In her January 2010 assessment, Dr. Brunson noted that "Timothy eagerly sought . . . attention by re-telling problematic incidents from the past." PX-24 at PBH006045. In a follow-up assessment from January 2011, Dr. Brunson noted that "Timothy's dialogue tends to be repetitive and concrete." DX-287 at PBH008719. Ms. Carter noted that "[Timothy] seems to like to repeat the same topics over and over again and revisit those a lot." 10/24/13 Tr. at 100:12-13 (Carter). Dr. Morganstein also noted that Timothy "has some go-to phrases and things that he repeats a lot" though she did not believe that necessarily reflected a limitation of Timothy's overall communication abilities. 9/11/13 Tr. at 58:14-59:9 (Dr. Morganstein). In videos observed during trial, Timothy made several repetitive references. And Ms. Parker, Timothy's group home manager, testified that "Timothy pretty much says the same thing over and over."

9/10/13 Tr. at 178:7-14 (Parker). The repetitive nature of Timothy's communication allows staff to better understand Timothy based on longevity of service as opposed to ASL ability. For example, when asked whether Jayvon, who the evidence shows is the least adept at ASL of Timothy's primary three caregivers, understood one of Timothy's repeated stories, Dr. Morganstein responded: "I think that [he] understands it, because he had experience with Timothy." 11/7/13 Tr. at 21:20-24 (Dr. Morganstein). Moreover, even if Timothy were able to learn new signs, a task which would likely present Timothy with considerable difficulty (see 10/24/13 at 61:7-19, 154:6-15 (Carter); 11/7/13 Tr. at 32:9-18 (Dr. Morganstein)), it appears problematical whether many, if any, would actually be employed.

Thus, Ms. Carter's conclusions that "[b]ased on his current language level and abilities, and given his current age, Timothy's results demonstrate that he needs caregivers who are able to sign basic information," and that "ensuring that a person has minimally adequate conversational sign language skill would be sufficient in addressing Timothy's language needs as well as stimulating his ideas and topics of conversation, albeit repetitive in nature" (DX-870 at 6-7 (emphasis added)) take Timothy's cognitive functioning into account in determining the necessary level of communication in the provision of Timothy's supervisory and rehabilitative services and thus are in line with the requirements of the Regulations.

With this conclusion, evidence that accommodations currently in place are providing staff with the skills necessary to adequately meet Timothy's supervisory and rehabilitative needs to the same or similar degree as another individual with a similar cognitive deficit precludes a finding for Plaintiffs on this claim. That is, Timothy's staff currently undergo some level of ASL training.

During closing arguments, by way of accommodation should they succeed on this claim, Plaintiffs requested that "the Court . . . order . . . the completion of a basic course in ASL at a local community college with passing grade" for Timothy's primary three caregivers (i.e., Ms. Parker, Tierre, and Jayvon) (11/14/13 Tr. at 34:18-21), but there has been no showing how a basic course at a local community college would compare to the mentoring currently in place or even what it might consist of.[36]  Moreover, as of trial, Ambleside had hired a deaf caretaker, fluent in ASL, who works with Timothy weekly.  9/10/13 Tr. at 101:5-10 (Rose B.).  Rose, who as Timothy's guardian brings this claim on his behalf, described the communication in Timothy's placement as "fair."  Id. at 101:21-23 (Rose B.).  In fact, generally, as previously noted, Rose expressed

---

[36] In fact, the minimal testimony regarding either the training in place or what a basic course at a local community college would entail reflects their apparent similarity.  That is, the only description of a basic ASL course at a community college came from Rose, who testified: "Like they do at the    you know, like    well, say Davidson County Community College, they have the classes that lasted so many    just hour or so, but they go like once a week for so many weeks.  That's how you get your basic course."  9/10/13 Tr. at 61:16-20 (Rose B.).  Ms. Parker described the training currently received by staff as follows:

A.    . . . .  We also contacted Reuben Leon from the deaf and hard-of-hearing services over here in Greensboro and he would come out.

Q.    How often do you think Reuben

A.    He came out once a week for four weeks.

Q.    And that was to train the new staff?

A.    Yes.

Q.    How long was each session that he conducted with the staff[?]

A.    A hour.

9/10/13 Tr. at 182:4-13 (Parker).

-74-

effusive praise for Ms. Parker and Tierre (id. at 82:23-83:13 (Rose B.)) as well as Jayvon, who, at the time of her testimony, was relatively new in working with Timothy. Indeed, Rose singled out Jayvon's desire to learn ASL, including his attendance in a course at "deaf school." See id. at 108:4-109:2 (Rose B.).[37]

Moreover, there is little evidence of adverse effects from a discrepancy in the ASL abilities of Timothy and his primary three caregivers. Rose failed to recall any consequences of Timothy's ability or inability to communicate with staff. See id. at 102:2-5 (Rose B.). Plaintiffs suggest that adequate communication would have prevented possible pain experienced by Timothy from an abscessed tooth, but there is little detail regarding the circumstances surrounding that event to reach that conclusion. In fact, Rose testified only: "He had an abscess tooth one time, and he was showing his self big time. I went down there and then he told me what the problem was, he had an abscess tooth. We got him to the dentist and got it fixed and that took care of that problem." Id. at 102:8-12 (Rose B.).

Plaintiffs also point to documentary and testimonial evidence that Timothy's behaviors are triggered, in part, generally by communication difficulties. For instance, Rose testified that "the behavior starts" when "Timothy can't communicate with another person or staff member or anyone else." Id. at 95:20-24 (Rose B.). Similarly, Dr. Bodfish testified that staff's "inability to communicate" with Timothy "directly caused increases or would contribute to inabilities to manage his behavior." 9/27/13 Tr. at 16:9-12 (Dr.

---

[37] Because Jayvon is not an employee of Ambleside, he does not attend the training offered within Timothy's home. However, there is no evidence of the substance of the ASL training that Jayvon is receiving.

Bodfish). Similarly, Plaintiffs point to a 2009 psychological assessment of Timothy which noted: "There have been reports that at least some of [Timothy's] acting out behavior occurs when there is no one available who could understand him, and this is probably true." PX-1 at PBH006067; 9/27/13 Tr. at 60:1-19 (Dr. Bodfish). However, there is also evidence that Timothy's behaviors were no better controlled around staff more proficient in ASL (see, e.g., PX-13 at 11269 (describing incident in January 2013 where a caretaker who is "fluent in many signs" and "who does signing" was unable to calm Timothy down and Timothy hit that caretaker in the stomach and attempted to elope and engage in property destruction)). Other reports describe difficult behaviors as a result of numerous suspected or unknown factors. See generally PX-194. Such reports highlight the difficulty of attributing Timothy's behavioral outbursts solely to communication difficulties, or, even more problematical, of attributing communication difficulties to ASL as opposed to cognitive functioning. Simply put, the evidence demonstrates that because of his cognitive functioning deficits, Timothy would gain little benefit from accommodations beyond those currently provided.

As a final note, Plaintiffs argue that Belton v. Georgia, No. 1:10-CV-0583-RWS, 2012 WL 1080304 (N.D. Ga. Mar. 30, 2012) (unpublished), should guide the instant analysis and a finding in their favor. However, the inquiry in Belton differed from that faced here in that the plaintiffs in Belton complained of a complete inability to enjoy group home services due to a dearth of staff with ASL abilities. Moreover, in Belton, the director of the Georgia Department of Behavioral health and Developmental Disabilities ("DBHDD") conceded the state's "'severe shortage'" of ASL fluent health care practitioners and testified that this shortage was "due to a lack of State resources and institutional

placements," see id. at *4.[38]  In contrast, in the instant action, not only has there been no similar concession regarding the insufficiency of the state's services for deaf individuals, but the evidence does not demonstrate that the ASL abilities of Timothy's staff fail to offer Timothy communication "as

---

[38] It is of some note that, even in Belton, where there did not appear to be a similar concern that the cognitive functioning of the plaintiffs significantly affected their ASL abilities, to the extent the Court addressed the need for ASL proficient practitioners in its Remedy Order, it provided:

> C.  Sign Language Instruction
>
>    i.  The Department shall provide sign language instruction for those Providers where persons who use sign language or, in the case of persons with severe language deficits, would benefit from sign language exposure, are present for more than two hours a day at least two days a week. This would include, but is not limited to, Prevocational programs and intensive outpatient programs.
>
>   ii.  At a minimum, this instruction should be provided until one-half working with Deaf persons are able to communicate at the "Survival" level of ASL proficiency, as defined by the [Sign Language Proficiency Interview ("SLPI")].

Belton, No. 1:10-CV-0583-RWS, Docket Entry 172 at 24 (N.D. Ga. Mar. 30, 2012) (unpublished) (emphasis added).  Defendants in that action have appealed that Order, see id., Docket Entry 185, filed a Motion to Stay Implementation of Sections of Remedy Order, see id., Docket Entry 187, and, subsequently, an Amended Motion to Stay Implementation of Sections of the Remedy Order, see id., Docket Entry 191.  With respect to the section of the Remedy Order regarding "Sign Language Instruction," the defendants argued:

> Requiring the Department to provide sign language instruction for providers with the stated goal is financially burdensome, potentially unwarranted as duplicative and contrary to the Department's limited resources for service as the Department would have to track, monitor and report individual staff sign language competencies of the 569 members of the provider network. Also, there is no evidence in this case that the Deaf and/or the named Plaintiffs have been denied access to services in the areas of prevocational programs and intensive outpatient programs.

Id., Docket Entry 191-1 at 13 (internal citation omitted).  The Court denied the defendants' Amended Motion to Stay, see id., Docket Entry 203, and the defendants' appeal of the Remedy Order remains pending.

effective as" with others who function at a similar cognitive level.  Thus, <u>Belton</u> offers little guidance.

V.

For the foregoing reasons, the Court finds in favor of Defendants.  A final judgment will issue in favor of Defendants and against Plaintiffs.

This the 28th day of August, 2014.

    /s/   N. Carlton Tilley, Jr.     <br>
Senior United States District Judge
